Filed 6/12/20

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| GOLDEN DOOR PROPERTIES, LLC, | D075328 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2018-0001-3324-CU-TT-CTL) |
| COUNTY OF SAN DIEGO, | |
| Defendant and Appellant. | |

_____

| | |
|---|---|
| SIERRA CLUB et al., | D075478 |
| Plaintiffs and Respondents, | |
| v. | (Super. Ct. No. 37-2018-0001-14081-CU-TT-CTL) |
| COUNTY OF SAN DIEGO, | |
| Defendant and Appellant. | |

_____

| | |
|---|---|
| SIERRA CLUB, | D075504 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2012-00101054-CU-TT-CTL) |
| COUNTY OF SAN DIEGO, | |
| Defendant and Appellant. | |

CONSOLIDATED APPEALS from judgments and orders of the Superior Court of San Diego County, Timothy Taylor, Judge. Affirmed in part, reversed in part, and remanded with directions. Requests for judicial notice denied.

Thomas E. Montgomery, County Counsel and Joshua M. Heinlein, Deputy County Counsel; Cox, Castle & Nicholson; Michael H. Zischke and Linda C. Klein, for Defendant and Appellant County of San Diego.

Chatten-Brown, Carstens & Minteer; Jan Chatten-Brown and Joshua R. Chatten-Brown for Plaintiffs and Respondents Sierra Club, Center for Biological Diversity, Cleveland National Forest Foundation, Climate Action Campaign, Endangered Habitats League, Environmental Center of San Diego and Preserve Wild Santee.

Latham & Watkins; Christopher W. Garrett, Daniel P. Brunton, Taiga Takahashi, Samantha K. Seikkula and Diego E. Flores, for Plaintiff and Respondent Golden Door Properties, LLC.

In this CEQA case,[1] the County of San Diego (County) challenges a judgment, writ of mandate, and injunction directing it to set aside its approvals of a Climate Action Plan (2018 CAP or CAP), Guidelines for Determining Significance of Climate Change, (Guidelines for Determining Significance), and supplemental environmental impact report (SEIR). The primary issue is whether a greenhouse gas (GHG) mitigation measure in the SEIR, called M-GHG-1, is CEQA-compliant. Under M-GHG-1, certain projects

---

[1] California Environmental Quality Act (CEQA), Public Resources Code section 2100 et seq.

may mitigate their in-County GHG emissions by purchasing carbon offsets originating elsewhere, including internationally.

Plaintiffs are (1) Sierra Club, Center for Biological Diversity, Cleveland National Forest Foundation, Climate Action Campaign, Endangered Habitats League, Environmental Center of San Diego, and Preserve Wild Santee (collectively Sierra Club); and (2) Golden Door Properties, LLC (Golden Door). Plaintiffs' overarching contention is that "[p]roperly restricted and verified offsets can be a valuable GHG mitigation strategy, but the offsets in M-GHG-1 provide no such assurances."

The superior court ordered the County to vacate its approvals of the CAP, Guidelines for Determining Significance, and the certification of the SEIR. The court also enjoined the County from relying on M-GHG-1 during review of greenhouse gas emissions impacts of development proposals on unincorporated County land.

Our primary holdings are: (1) M-GHG-1 violates CEQA because it contains unenforceable performance standards and improperly defers and delegates mitigation. (2) The CAP is not inconsistent with the County's General Plan. (3) However, the County abused its discretion in approving the CAP because the CAP's projected additional greenhouse gas emissions from projects requiring a general plan amendment is not supported by substantial evidence. (4) The SEIR violates CEQA because its (a) discussion of cumulative impacts ignores foreseeable impacts from probable future projects; (b) finding of consistency with the Regional Transportation Plan is not supported by substantial evidence; and (c) analysis of alternatives ignores a smart-growth alternative.

To be abundantly clear, our holdings are necessarily limited to the facts of this case, and in particular, M-GHG-1. Our decision is not intended to be, and should not be construed as blanket prohibition on using carbon offsets—even those originating outside of California—to mitigate GHG emissions under CEQA.

Similarly, our holding regarding the CAP's invalidity is a narrow one. The judgment requiring the County to set aside and vacate its approval of the CAP is affirmed because the CAP's greenhouse gas emission projections assume effective implementation of M-GHG-1, and M-GHG-1 is itself unlawful under CEQA. Except to the extent that (1) the CAP is impacted by its reliance on M-GHG-1; and (2) the CAP's inventory of greenhouse gases is inconsistent with the SEIR (see part IX, *post*), the CAP is CEQA-compliant.

This is the third time the County's attempt to adopt a viable climate action plan and related CEQA documents has been before this court. In an attempt to avoid a fourth, we further note that the CAP contains a GHG reduction measure (T-4.1) designed to offset in-County GHG emissions. As explained *post*, T-4.1 significantly differs from M-GHG-1 in several respects and, perhaps more importantly in indicating the types of offset protocols that might pass muster, is unchallenged in this litigation.

FACTUAL BACKGROUND

A. *Overview*

This is a complex case, in part because of the size of the record (approximately 72,000 pages), and the extensive litigation history, which spans nearly a decade with two

4

prior opinions from this court.[2]  We begin with an overview of some of the key documents in the case.  Because acronyms are used throughout, a glossary is appended at the end of this opinion.

1.  *GHG emission reduction*

"Greenhouse gases absorb infrared radiation and trap the heat in the Earth's atmosphere, rather than allowing the radiation to escape into space. . . .  [¶]  Fossil fuel combustion is the source of the vast majority of the United States' [GHG] emissions. . . . In 2010, California produced 452 million metric tons (MT) of $CO_2e$.[3]  The transportation sector was the largest contributor to California's [GHG] emissions, producing 38 percent of the state's total. . . ."  (*Irritated Residents*, *supra*, 17 Cal.App.5th at pp. 731-732.)

The Legislature has "emphatically established as state policy the achievement of a substantial reduction in the emission of gases contributing to global warming."  (*Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 62 Cal.4th 204, 215 (*Center for Biological Diversity*).)  This policy is implemented in CEQA.

_____

[2]  *Sierra Club v. County of San Diego* (2014) 231 Cal.App.4th 1152 (*Sierra Club I*) and *Golden Door Properties, LLC v. County of San Diego* (2018) 27 Cal.App.5th 892 (*Golden Door*).

[3]  The capacity of each GHG to retain heat varies.  Emissions of GHGs are expressed as $MTCO_2e$, which is the amount of carbon dioxide in metric tons that would have the same global warming potential as the emission of the particular GHG. (*Association of Irritated Residents v. Kern County Bd. of Supervisors* (2017) 17 Cal.App.5th 708, 731, fn. 6 (*Irritated Residents*).)

5

CEQA requires a lead agency to "make a good-faith effort, based to the extent possible on scientific and factual data, to describe, calculate or estimate the amount of [GHG] emissions resulting from a project." (Cal. Code Regs., tit. 14, § 15064.4, subd. (a).)[4] In determining the significance of a project's GHG emissions, CEQA directs the lead agency to consider, among other things, the "extent to which the project complies with regulations or requirements adopted to implement a statewide, regional, or local plan for the reduction or mitigation of [GHG] emissions." (Guidelines, § 15064.4, subd. (b)(3).)

The California Air Resources Board (CARB) is "the state agency charged with monitoring and regulating sources of emissions of greenhouse gases that cause global warming in order to reduce emissions of greenhouse gases." (Health & Saf. Code,[5] § 38510.) CARB has pursued several strategies for reducing GHG emissions, including a cap-and-trade program. (Cal. Code Regs., tit. 17, §§ 95801-96022; *Association of Irritated Residents v. State Air Resources Bd.* (2012) 206 Cal.App.4th 1487, 1498, fn. 6.)

2. *Cap-and-trade*

" 'Cap-and-trade is a market-based approach to reducing pollution. The "cap" creates a limit on the total amount of emissions from a group of regulated sources, and

---

4    The CEQA Guidelines in title 14 of the California Code of Regulations, section 15000 et seq., are hereafter cited as Guidelines. We give them great weight "except where they are clearly unauthorized or erroneous." (*Center for Biological Diversity*, *supra*, 62 Cal.4th at p. 217, fn. 4.)

5    Undesignated statutory references are to the Health and Safety Code.

generally imposes no particular emissions limit on any one firm or source.' " (*Association of Irritated Residents v. State Air Resources Bd.*, *supra*, 206 Cal.App.4th at p. 1498, fn. 6.)  " 'The "trade" aspect of a cap-and-trade program creates an incentive for businesses to seek out cost-effective reductions, while also encouraging rapid action to reduce emissions quickly.  Regulated entities receive allowances . . . representing the right to emit a ton of greenhouse gas emissions.  At specified intervals, regulated businesses must surrender an allowance for each ton of GHG . . . they release.  Over time, the total amount of allowances available to all sources is reduced, meaning overall emissions from those sources must be also reduced.  If an individual source does not need all of the allowances it has in a given period, it may "bank" those allowances to surrender later or sell them to another registered party.  The ability to sell allowances to other businesses that need them creates a market price for pollution reductions and an incentive for businesses to achieve the maximum reductions possible at the lowest cost.' "  (*Ibid.*)

Thus, under cap-and-trade, GHG emitters may comply with the cap by purchasing GHG reductions that others achieve, called offsets.  Offset credits can be produced by a variety of activities that reduce or eliminate GHG emissions or increase carbon sequestration.[6]

Under cap-and-trade, offset projects must comply with rules and procedures— called Compliance Offset Protocols (CARB Protocols), which CARB adopts and

---

[6]     Carbon emissions are sequestered, for example, by trees, which absorb carbon from the atmosphere.

7

administers through an Offset Project Registry (OPR).  (Cal. Code Regs., tit. 17, §§ 95973, subd. (a)(1); 95987, subd. (a).)  OPRs facilitate "the listing, reporting, and verification of offset projects developed using the [Protocols], and issue registry offset credits."[7]  OPRs must be approved by CARB and "shall use [CARB Protocols] to determine whether an offset project may be listed . . . for issuance of registry offset credits."  (Cal. Code Regs., tit. 17, §§ 95986; 95987, subd. (a).)  Entities can use offsets to fulfill only up to 8 percent of their compliance obligation.  (*Id.*, § 95854, subd. (b).)

GHG offsets "must be real, additional, quantifiable, permanent, verifiable, and enforceable."  (Cal. Code Regs., tit. 17, § 95802, subd. (a).)  Numerous statutes and regulations are designed to ensure these criteria are met.  (Health & Saf. Code, § 38562; Cal. Code Regs., tit. 17, § 95100 et seq.)

### 3. *The broad contours of this case*

This case involves the County's (1) CAP; (2) associated General Plan Amendment to the County's 2011 General Plan Update (GPU); (3) a threshold of significance for GHG emissions; and (4) Guidelines for Determining Climate Change—collectively the

---

[7]     (OPR <https://ww3.arb.ca.gov/cc/capandtrade/offsets/registries/registries.htm> [as of June 12, 2020] archived at <perma.cc/WXF5-66TKU>).

"Project."  The County as lead agency prepared the Project's SEIR, which addresses GHG impacts in the County's unincorporated areas and from County operations.[8]

The superior court determined that the CAP is inconsistent with the GPU and, therefore, invalid.  The court also determined that M-GHG-1 violates CEQA by (1) requiring the purchase of out-of-County offsets without legally sufficient analysis; and (2) unlawfully delegating and deferring feasibility findings.  The superior court further determined that the SEIR violates CEQA by inadequately analyzing (a) cumulative GHG impacts; (b) impacts to "energy and environmental justice"; and (c) "smart growth mitigation or alternatives for [General Plan Amendment projects]."  The court also determined that the County violated CEQA by failing to properly respond to comments on the draft SEIR (DSEIR).

Documents discussed throughout this opinion, introduced here and explained in more detail later, are:

>  (1) **2011 General Plan Update** (**GPU**):  A comprehensive, long-term plan for developing unincorporated areas of the County.  Calls for reducing GHG emissions to meet state GHG targets, and requires preparation of a Climate Action Plan to achieve this reduction.

>  (2) **2011 Program Environmental Impact Report (PEIR)**: Analyzes environmental impacts from implementing the GPU. Requires a climate action plan be prepared.

>  (3) **2018 Climate Action Plan (2018 CAP or CAP)**: Establishes a baseline inventory of GHG emissions in the unincorporated County and from County operations.  Projects future

---

[8]     County operations include County facilities and operations located within the unincorporated County communities and in the incorporated cities.

9

GHG emissions and contains measures to meet state GHG reduction targets.

(4) **Guidelines for Determining Significance of Climate Change (Significance Guidelines)**:  Contains criteria and a checklist to determine a project's consistency with the CAP.

(5) **2018 Supplemental EIR (SEIR)**:  Analyzes environmental impacts from implementing the CAP and contains mitigation measures, including M-GHG-1.



B. *The GPU*

The unincorporated County contains 3,570 square miles and as shown in the map *post*, is mostly undeveloped.



In 2011, the County updated its general plan, establishing "a blueprint for future land development projects in the unincorporated County that meets community desires and balances the environmental protection goals with the need for housing, agriculture, infrastructure, and economic vitality."

The GPU contains principles guiding future growth that are intended to retain the County's "rural character, economy, and unique communities, as well as minimizing the environmental impacts of future development."  To accomplish these goals, the GPU "shifts growth capacity from the eastern backcountry areas to western communities" by encouraging growth "in villages with 'compact land development patterns to minimize intrusion into agricultural lands and open spaces; reduce travel distances to local services

11

and businesses, while also inducing community association, activity, and walking.' "  The

GPU seeks to "develop lands and infrastructure more sustainably in the future."[9]

The GPU contains a "Vision Statement" and "Guiding Principles."  These

"represent[] the basis by which all updated plan goals, policies, and implementation

programs are measured . . . ."  Addressing GHG emissions, the Vision Statement

provides:

> "[T]he Land Use Map provides a mix and density of land uses
> that will minimize automobile trips and their length, invigorate the
> economic health of our businesses, and promote association with our
> neighbors.  These, coupled with increased access to transit, will
> reduce our air emissions, greenhouse gas emissions, energy
> consumption, [and] noise . . . ."

C. *Climate Change Legislation*

California's "landmark legislation addressing global climate change, the California

Global Warming Solutions Act of 2006," is commonly referred to as Assembly Bill

No. 32 (Assem. Bill No. 32).  (*Center for Biological Diversity*, *supra*, 62 Cal.4th at

p. 215.)  Assem. Bill No. 32 calls for reducing GHG emissions to 1990 levels by 2020.

(*Ibid*.)

In 2016, the Legislature enacted Senate Bill No. 32 (Sen. Bill No. 32), "which

adopts a goal of reducing [GHG] emissions by 40 percent below 1990 levels by the year

---

[9]    Sustainability means "simultaneously meeting our current economic, environmental, and community needs, while also ensuring that we are not jeopardizing the ability of future generations to meet their needs."

2030. This 40 percent reduction is widely acknowledged as a necessary interim target to ensure that California meets its longer-range goal of reducing [GHG] emissions to 80 percent below 1990 levels by the year 2050." (*Cleveland National Forest Foundation v. San Diego Assn. of Governments* (2017) 3 Cal.5th 497, 519 (*Cleveland National*).)[10]

These mandates are a key element of the GPU's goals and policies. GPU Goal COS-20 (as originally adopted) provides for the "[r]eduction of local GHG emissions contributing to climate change that meet or exceed requirements of the Global Warming Solutions Act of 2006." Policy COS-20.1 likewise provides that the County shall "[p]repare, maintain, and implement a climate action plan with a baseline inventory of GHG emissions from all sources; GHG emissions reduction targets and deadlines, and enforceable GHG emissions reduction measures."[11]

One of the GPU's guiding principles is that "land should be developed more compactly, resulting in reduced automobile use and increased use of public transit,

---

[10]     Sierra Club's request for judicial notice of Executive Order No. B-30-15, pertaining to the 40 percent reduction target, is denied as irrelevant. (*San Diegans for Open Government v. San Diego State University Research Foundation* (2017) 13 Cal.App.5th 76, 90, fn. 8 (*SDOG*).)

[11]     As part of the Project, the County amended COS-20 and COS 20.1 in 2018. COS 20 as amended provides: "Reduction of community-wide (i.e., unincorporated County) and County Operations greenhouse gas emissions contributing to climate change that meet or exceed requirements of the Global Warming Solutions Act of 2006, as amended by [Sen. Bill No. 32] . . . ." As amended, COS-20.1 provides, "Prepare, maintain, and implement a Climate Action Plan for the reduction of community-wide (i.e., unincorporated County) and County Operations greenhouse gas emissions consistent with . . . Guidelines Section 15183.5."

13

walking, and bicycling. This will result in less consumption of gasoline, generation of less air pollution and GHG emissions, the preservation of greater amounts of habitat and agricultural lands, and the improvement of the lifestyles and health of community residents." The GPU promotes reductions in vehicle trips, gasoline consumption, and GHG emissions by containing 41 "mobility strategies."

    D. *The PEIR*

The PEIR addresses the environmental impacts from implementing the GPU.[12] The PEIR did not "speculate on the individual environmental impacts of specific future development projects," but rather considered "build-out of the General Plan land use designations up to forecasted population and housing unit totals."

Growth consistent with the GPU would create in-County GHG emissions. Mitigation measures are necessary to achieve state GHG reduction targets. PEIR mitigation measure CC-1.2 requires the County to prepare a climate action plan with "comprehensive and enforceable GHG emissions reduction measures" to achieve mandated GHG targets.

The County adopted the GPU and certified the PEIR in August 2011.

---

[12]     A program EIR considers " 'a series of actions that can be characterized as one large project and are related . . . .' " (Guidelines, §15168, subd. (a).) This allows the lead agency to consider "broad policy alternatives and program wide mitigation measures. . . ." (*Cleveland National Forest Foundation v. San Diego Assn. of Governments* (2017) 17 Cal.App.5th 413, 425 (*Forest Foundation*).)

E.  *The 2018 CAP*

1.  *The CAP applies to projects that are consistent with GPU-allowed land use*

Broadly speaking, there are two types of development projects in the County.  One type is a project proposing land use that is completely consistent with that allowed under the General Plan.  The other type is a project proposing intensity or density of land use exceeding that allowed under the General Plan—that is, a project requiring a general plan amendment.

"The scope of the CAP is to serve as mitigation to reduce GHG emissions resulting from buildout of the 2011 GPU . . . ."  In other words, to the extent a project is consistent with land use allowed under the GPU, the project applicant must mitigate GHG emissions with CAP GHG reduction measures.

2.  *The CAP's GHG inventory*

The CAP establishes a baseline inventory of GHG emissions against which to measure future reductions.  The baseline consists of GHG emissions from activities within the unincorporated County and from County operations as of 2014.  Although Assem. Bill No. 32 and Sen. Bill No. 32 use 1990 as a benchmark, 2014 is the most recent year in which accurate information is available to inventory GHG emissions in the unincorporated County.  This inventory includes GHG emissions from projects requiring a general plan amendment because of increased density or intensity of land use beyond that allowed under the GPU (hereafter, such projects are referred to as GPAs), but only if the GPA project was constructed as of 2014.

15

### 3. *The CAP's GHG projections*

The CAP also projects future GHG emissions for development consistent with GPU allowed land use. These projections, based on current trends, population growth, and known legislation, are called " 'business-as-usual' " projections. The projections assume no additional local GHG reduction efforts and regulations will be undertaken, and that population, housing, employment, and transportation will grow consistent with San Diego Association of Governments (SANDAG) projections.

The CAP's GHG projections do not include GPA projects under review, but not yet adopted by the County (hereafter referred to as in-process GPAs).[13] However, the projections include GHG emissions from GPA projects adopted between August 2011 (the date of the GPU) and August 2017 (the date the DSEIR was publicly released). The projections also account for anticipated legislation that will reduce future emissions without any additional County action. This includes, for example, anticipated increased electric vehicle use.

The CAP's 2014 baseline and projected GHG emissions in $MTCO_2e$ are:

| 2014 Baseline | 2020 Projection | 2030 Projection | 2050 Projection |
|---|---|---|---|
| 3,211,505 | 3,018,671 | 2,824,049 | 2,991,507 |

---

[13]  Such projects are instead analyzed in the cumulative impact analysis in the SEIR, where M-GHG-1 applies.

4. *GHG reduction targets and measures*

To meet legislative GHG emission reduction targets, CARB recommends reducing emissions to six $MTCO_2e$ per capita by year 2030 and to two $MTCO_2e$ per capita by 2050. This is equivalent to reducing 2014 emissions by 40 percent (by 2030) and 77 percent (by 2050). Therefore, to meet state targets, the County must reduce GHG emissions to 1,926,903 $MTCO_2e$ by 2030 (40 percent below 2014 levels) and to 738,646 $MTCO_2e$ by 2050 (77 percent below 2014 levels).

The CAP contains 26 measures intended to meet these targets. "All [26] GHG [r]eduction [m]easures in the CAP will be implemented within the unincorporated County and from County operations . . . ." Likewise, all CAP GHG reduction measures "will achieve GHG reductions locally (i.e., from County operations and within the unincorporated County)."

The County "collaborated with over 50 stakeholder groups in the environmental, business, and community sectors during a total of over 100 public events to gather input to inform development of strategies and measures for the CAP. The primary determinant for whether a measure was chosen was its GHG reduction potential and whether it would help the County achieve its GHG reduction target in 2030. Measures were also assessed for their applicability and effectiveness in the County's unique rural setting. . . . As shown in the CAP, the selected measures are anticipated to meet state targets through 2030." All of the CAP's reduction measures "would need to be implemented . . . to meet the reduction targets."

17

CAP measures include, for example, County acquisition of (1) open space, which would reduce GHG emissions by preserving land that can otherwise be developed; and (2) easements on agricultural land to extinguish future development potential. Under another measure, the County will update 15 community plans by 2030, and an additional four between 2031 and 2040 to incorporate a balanced approach to housing, jobs, services, and infrastructure—including bike lane improvements, shared parking, and community centers located in a core area. The CAP measures also include installing electric vehicle charging stations, encouraging solar water heater installation, and streamlining the permitting of solar energy production.

The CAP's GHG reduction measures may also produce "co-benefits"—"additional jobs and economic development, cleaner air, fewer illnesses and disease, reduced energy and water costs, or an overall improvement in the quality of life and public health."

### 5. *CAP reduction measure T-4.1*

Once implemented, the CAP's suite of measures may require adjustment to stay on target. To provide needed flexibility, the CAP includes measure T-4.1, under which the County may make "direct investments in local projects to offset carbon emissions."

"A direct investment project is created when a specific action is taken that reduces, avoids, or sequesters GHG emissions." For example, the County could invest in a weatherization project that reduces carbon emissions within the county while also reducing residents' heating and cooling expenses. Other direct investment projects are urban forest and urban tree planting.

Under T-4.1, the "County will not purchase carbon offset credits . . . but will . . . track carbon offsets achieved through County direct investment projects" within the unincorporated County. Emissions reductions occur, but unlike in cap-and-trade, offsets are not traded as an independent commodity. The SEIR estimates that T-4.1 can achieve 176,614 MTCO$_2$e reductions by 2030.

T-4.1 "would be implemented throughout the unincorporated County, where the benefits of carbon sequestration and GHG emissions reductions would occur." Direct investment projects must comply with (1) "established protocols that have been approved by . . . CARB, the California Air Pollution Control Officers Association (CAPCOA), or the San Diego County Air Pollution Control District"; (2) "that received 'public review prior to adoption' "; and (3) the project must yield GHG reductions that are additional— that is, beyond what will occur under business-as-usual operations and reductions not otherwise mandated. "Adherence to the protocols ensures that the carbon reductions generated by the project are real, permanent, quantifiable, verifiable, and enforceable." An independent, qualified third-party must verify the GHG reduction achieved.[14]

6. *CAP implementation and monitoring*

The County will annually report the CAP's implementation, update the GHG emissions inventory every two years, and every five years report findings from these updates. "[I]f certain measures have proven successful, additional investment in those measures may be made; or, conversely, if certain measures are proving to be more

---

[14] Plaintiffs do not challenge T-4.1 or any other CAP GHG reduction measure.

19

difficult to achieve, then the County may redirect its efforts to other measures to achieve overall GHG reduction targets."

7. *Consistency with the CAP is the threshold of significance*

CEQA requires public agencies to conduct an environmental review of discretionary projects they approve and to prepare an EIR for any project that may have a significant effect on the environment. (Pub. Resources Code, § 21151, subd. (a).) The Guidelines encourage public agencies to develop "thresholds of significance" to assist in determining whether a project's effect will be deemed significant. (Guidelines, § 15064.7.) " 'A threshold of significance is an identifiable quantitative, qualitative or performance level of a particular environmental effect, non-compliance with which means the effect will normally be determined to be significant by the agency and compliance with which means the effect normally will be determined to be less than significant.' " (*California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2016) 2 Cal.App.5th 1067, 1072-1073.)

The Project's threshold of significance for GHG emissions is consistency with the CAP:

> "A proposed project would have a less than significant cumulatively considerable contribution to climate change impacts if it is found to be consistent with the County's Climate Action Plan; and, would normally have a cumulatively considerable contribution to climate change impacts if it is found to be inconsistent with the County's Climate Action Plan."

20

Details on how to achieve consistency with the CAP are in a separate document, the Guidelines for Determining Significance, which also contains a checklist of CAP GHG reduction measures, called the CAP Consistency Review Checklist (Checklist).

The Checklist implements a two-step process to determine consistency with the CAP. The first step assesses whether a project is consistent with growth projections and land use assumptions in the GPU. Those assumptions are the basis of the CAP's GHG emissions projections.

*Thus, if a project's land use is consistent with the GPU, then its GHG emissions are already accounted for in the CAP's projections (because the projections assume build-out under the GPU).* In that event, the proposed project will achieve GHG reduction targets by implementing CAP reduction measures.

In step two, the project applicant uses the Checklist to itemize and describe how the project will implement applicable CAP GHG reduction measures.[15] For example, applicants for a residential development must indicate on the Checklist whether the project will implement electric or alternatively-fueled water heating systems.

In-process GPAs that the County had not adopted by August 2017 are not included in the CAP's GHG projections. Such projects achieve consistency with the CAP under M-GHG-1, which we discuss next.

---

[15] The CAP and Checklist also applies to projects requiring a land use and/or zoning amendment to the GPU, but which would result in an equivalent or less GHG-intensive project when compared to those allowed under the GPU.

E. *The SEIR and M-GHG-1*

1. *The SEIR, in general*

Twenty-one GPAs were in-process as of August 2017. The SEIR acknowledges that in-process GPAs are reasonably foreseeable, could result in significant GHG impacts and, therefore, are included in the SEIR's cumulative GHG impacts analysis. The SEIR also recognizes that these and future GPAs are not accounted for in the CAP and may impact the County's ability to meet CAP targets. To the extent in-process and future GPAs would increase GHG emissions above projected CAP levels, their impact would be significant (i.e., inconsistent with the CAP). The SEIR requires GPAs to use M-GHG-1 to mitigate GHG emissions to be within the threshold of significance, i.e., to not exceed the CAP's GHG emission projections.

2. *M-GHG-1, in general*

M-GHG-1 "requires a project that increases density or intensity [of land use] above what is allowed in the [GPU] to mitigate GHG emissions first through all feasible onsite design features . . . ." Onsite design features may include "land use and design features that reduce VMT [Vehicle Miles Traveled], promote transit oriented development, promote street design policies that prioritize transit, biking, and walking, and increase low carbon mobility choices, including improved access to viable and

22

affordable public transportation . . . ."[16]  If onsite design features are insufficient to fully

mitigate GHG emissions, then the project may use offsite mitigation, including in some

cases purchasing offset credits originating from projects anywhere in the world.[17]

Under M-GHG-1, the GPA project may mitigate GHG emissions under either of

two options:  The first is called "No Net Increase."  Under this option, "GPA project

applicants shall achieve no net increase in GHG emissions from additional density above

the 2011 GPU."  For example, "if 400 residential units were allowed under the GPU and

a GPA proposes 500 residential units, the emissions for the 400 would be mitigated by

implementing CAP reduction measures, thereby reducing GHG impacts from the 400

units to below significance.  GHG emissions for the 100 additional units must be

mitigated to zero through "onsite design features and mitigation measures and offsite

mitigation, including the purchase of carbon offset credits . . . ."

Option two is called "Net Zero."  Under this option, GPA applicants shall reduce

all project GHG emissions to zero.  Applicants shall first demonstrate compliance with

CAP measures before considering additional feasible onsite design features and

mitigation measures.  Offsite mitigation, including purchase of carbon offset credits,

---

16      "Generally, vehicle miles traveled [VMT] is the most appropriate measure of
transportation impacts. . . .   VMT refers to the amount and distance of automobile travel
attributable to a project."  (Guidelines, § 15064.3, subd. (a).)

17      The text of M-GHG-1 is in Appendix 2 to this opinion.

23

would be allowed after all feasible onsite design features and mitigation measures have been incorporated.

Common to both options is the goal to reduce to zero any increases in GHG emissions over those projected in the CAP. If that occurs, CAP GHG emission forecasts are unaffected by the GPA project. Accordingly, the GPA project would be consistent with the CAP, and thus within the threshold of significance for GHG emissions.

F. *CEQA Streamlining*

To avoid repetition, wasted time, and unnecessary speculation, a lead agency may "tier" environmental impact reports for a sequence of actions so that later EIRs incorporate and build on the information in the previous CEQA document. (Pub. Resources Code, §§ 21068.5; 21093, subd. (a).) Projects that are consistent with the GPU and implement CAP GHG reduction measures may incorporate by reference the CAP's cumulative GHG analysis. Conversely, projects that are consistent with the GPU but do not implement CAP GHG reduction measures, as well as GPAs—will require a project-level GHG analysis.

## PROCEDURAL HISTORY[18]

A. *Sierra Club Petition*

After the County certified the SEIR, Sierra Club filed a petition for a writ of mandate challenging the County's approval of the CAP, Significance Guidelines,

---

[18]    Procedural history predating the events described here is contained in *Sierra Club I*, *supra*, 231 Cal.App.4th at pp. 1156-1163 and *Golden Door*, *supra*, 27 Cal.App.5th at pp. 896-898.

threshold of significance for GHG emissions, and the SEIR. In the trial court, Sierra Club asserted (1) the CAP and SEIR violated CEQA because M-GHG-1 allows "in-County emissions from in-process and future GPAs to increase, provided there are offsets purchased somewhere in the world, without demonstrating that such offsets will be fully enforceable, verifiable, permanent, and additional"; (2) the County "gutted Mitigation Measure CC-1.2 by establishing a target of "a mere 2 [percent] reduction in emissions within the County from 2014 levels by 2020"; (3) the SEIR fails to analyze the CAP's impact on the Regional Transportation Plan/Sustainable Communities Strategy (RTP/SCS); (4) the County improperly failed to update its transportation modeling "using data that included the recently approved GPAs, all reasonably expected GPAs, and the approval of new residential development in far-flung rural areas"; (5) the SEIR failed to analyze impacts from increased vehicle miles that would result from allowing "GPA applicants to purchase GHG offsets"; (6) the SEIR fails to consider an alternative in which "land use classifications and new GPA approvals" comport with and achieve certain VMT reduction goals; (7) The SEIR fails to make good faith, reasoned responses to public comments; (8) the SEIR fails to analyze environmental justice impacts; and (9) the CAP and threshold of significance are inconsistent with the GPU.

B. *Golden Door Petition and Consolidation*

In a separate action, Golden Door sought injunctive and declaratory relief. Golden Door alleged that it is the "owner and operator of an award-winning hospitality and agricultural operation . . . situated on approximately 600 acres" in San Diego County. Golden Door challenged the County's compliance with its General Plan and CEQA "to

25

the extent that the County has failed, in its newly adopted CAP, to adhere to requirements to achieve 'reduction of community-wide (i.e., unincorporated County) and County Operations greenhouse gas emissions' and other legal requirements."

In the trial court, Golden Door primarily asserted that the County violated CEQA (and acted inconsistently with the GPU) by adopting a "program for carbon offset credits ('offsets') that would allow in-process and future ['GPAs'] to *increase* [GHGs] within the County, in exchange for the purchase of offsets applicable to elsewhere in the world . . . ." Golden Door asserted that the County "did not even attempt to quantify the GHGs from the known, in-process GPAs, even though the 2018 CAP Project clearly intended the offset program to apply to all GPAs." Golden Door also asserted that the County improperly delegated and deferred feasibility findings in M-GHG-1 and failed to adequately analyze: (1) VMT and other impacts resulting from implementing M-GHG-1; (2) cumulative GHG impacts; (3) energy and environmental justice; and (4) smart growth mitigation or alternatives for GPAs. Like Sierra Club, Golden Door also claimed that the County failed to adequately respond to comments.

By stipulation, the trial court consolidated these two cases, along with a third (*Sierra Club v. County of San Diego*, No. 37-2012-00101054-CU-TT-CTL) that had been stayed.

After hearing, the trial court granted an (amended) peremptory writ of mandate, ordering the County to set aside its approvals of the CAP, Guidelines for Determining Significance, Checklist, certification of the SEIR, and "all attendant approvals in reliance thereon . . . ." The trial court also entered a permanent injunction, providing: "During

26

review of [GHG] emissions impacts of development proposals on unincorporated County lands under CEQA, including in the review of such impacts prior to the issuance of any permits or entitlements for any General Plan amendment projects approved after February 14, 2018, the County . . . shall not rely on Mitigation Measure M-GHG-1 . . . ." Subsequently, the court entered a "final judgment" that also declared "that the February 2018 Climate Action Plan and the certification of the Final SEIR to the 2011 General Plan Update Program EIR are legally inadequate and may not be used to provide the basis for CEQA review of GHG impacts of development proposals in the unincorporated County."

C. *Appeals and Consolidation*

The County filed a notice of appeal in the consolidated cases from "all judgments and orders" including the writ of mandate and the permanent injunction. This court consolidated the three appeals.

DISCUSSION

I.

*THE CAP IS NOT INCONSISTENT WITH THE GPU*

A. *The Trial Court's Ruling*

In the trial court, Plaintiffs asserted that the CAP is inconsistent with the GPU because (1) M-GHG-1 is "part and parcel" of the CAP; and (2) the GPU requires reducing *in*-County emissions; however, M-GHG-1 allows purchasing carbon offsets "anywhere in the world." Noting the "paucity of offsets available within the County,"

27

Sierra Club asserted, "offsets are all but certain to come from outside the County," thus violating a prime directive in the GPU.

The superior court agreed with Plaintiffs, stating, "[T]he County's General Plan has consistently . . . stated it required in-County GHG reductions. However, M-GHG-1, which is expressly incorporated into the 2018 CAP . . . allows essentially unlimited increases in GHG within the County. In this respect, applicants proposing projects in the County can meet their GHG mitigation requirements by purchasing offsets from anywhere in the world . . . ."

The County contends the court erred because (1) M-GHG-1 is not a mitigation measure of the CAP. Rather, M-GHG-1 is a mitigation measure in the SEIR and only applies to GPAs; (2) the CAP is, therefore, not inconsistent with the GPU; and (3) GPAs using M-GHG-1 would mitigate GHG emissions to be within CAP projections and, therefore, be consistent with the GPU. We agree with the first and second points, and find it unnecessary to consider the third in this context.

B. *The Consistency Requirement*

Land use decisions must be consistent with the policies expressed in a general plan. (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 570 (*Citizens of Goleta Valley*).) This doctrine is " 'the linchpin of California's land use and development laws; it is the principle which infused the concept of planned growth with the force of law.' " (C*orona-Norco Unified School Dist. v. City of Corona* (1993) 17 Cal.App.4th, 994.) However, " 'it is nearly, if not absolutely, impossible for a project to be in perfect conformity with each and every policy set forth in the applicable plan. . . .

28

It is enough that the proposed project will be compatible with the objectives, policies, general land uses and programs specified in the applicable plan.' " (*Save Our Heritage Organisation v. City of San Diego* (2015) 237 Cal.App.4th 163, 186.)

C. *The Standard of Review*

Our role is the same as that of the trial court. (*Naraghi Lakes Neighborhood Preservation Assn. v. City of Modesto* (2016) 1 Cal.App.5th 9, 19.) Review "is highly deferential to the local agency, 'recognizing that "the body which adopted the general plan policies in its legislative capacity has unique competence to interpret those policies when applying them in its adjudicatory capacity. [Citations.] Because policies in a general plan reflect a range of competing interests, the governmental agency must be allowed to weigh and balance the plan's policies when applying them, and it has broad discretion to construe its policies in light of the plan's purposes. [Citations.] A reviewing court's role 'is simply to decide whether the [governing body] officials considered the applicable policies and the extent to which the proposed project conforms with those policies.' [Citation.]" [Citation.]' " (*Friends of Lagoon Valley v. City of Vacaville* (2007) 154 Cal.App.4th 807, 816.) "It is, emphatically, not the role of the courts to micromanage these development decisions." (*Sequoyah Hills Homeowners Assn. v. City of Oakland* (1993) 23 Cal.App.4th 704, 719 (*Sequoyah Hills*), italics omitted.)

D. *The CAP is Not Inconsistent with the GPU*

The CAP's GHG reduction measures apply only to the extent development is consistent with land use allowed under the GPU. In such cases, the project's emissions have already been accounted for in the CAP's projections. By incorporating the CAP's

29

GHG mitigation measures, a project will reduce its GHG emissions to levels consistent with state GHG reduction targets.

In contrast, M-GHG-1 applies only to "in-process and future" GPAs—that is, development involving density or intensity of land use above that allowed under the GPU. To the extent such projects exceed CAP emission projections, their emissions are not included in the CAP and, therefore, must be mitigated to zero to keep the County on track to meet state targets. M-GHG-1 is intended to be that mitigation program. The CAP explains this, stating:

> "With incorporation of Mitigation Measure GHG-1, GPAs listed in the cumulative impact discussion of the Draft SEIR and all future GPAs that propose increased density/intensity above what is allowed in the General Plan will comply with the CAP and, therefore, will not interfere with the County's 2020 and 2030 GHG reduction targets or 2050 goal. General Plan Amendments would, therefore, comply with the threshold of significance, which is consistency with the CAP."

Thus, although the CAP *refers* to M-GHG-1, M-GHG-1 is not one of the CAP's GHG reduction measures. Rather, the 26 *local* measures, none of which involve purchasing carbon offsets outside the County—are the heart of the CAP. If the analysis were to stop here, we would conclude that the CAP is fully consistent with the GPU because the CAP analyzes GHG emissions resulting from buildout under the GPU. Moreover, all of the CAP's GHG reduction measures will be implemented locally, thus reducing GHG emissions in the County, which is also fully consistent with the GPU.

However, the CAP is not entirely independent from M-GHG-1. The CAP projects future GHG emissions in the County. Those projections *exclude* emissions from

30

in-process GPAs and future GPAs.  The CAP's projections exclude these foreseeable GHG emissions on the assumption that such projects will mitigate their GHG emissions to zero (or net zero) under M-GHG-1.  The CAP states:

> "General Plan Amendment projects currently in process . . . have not been included in the 2014 GHG . . . projections. . . .  GPAs have the potential to result in a significant cumulative impact and also impact the ability of the County to meet its targets and goal.  However, Mitigation Measure GHG-1 is provided to reduce the cumulative impact to less than significant.  In addition, [M-GHG-1] would be required for all future GPAs . . . ."

As noted *ante*, M-GHG-1 allows mitigating in-County GHG emissions with offset credits originating outside the County—even in another country.  However, the GPU expresses fundamental principles "designed to protect *the County's* unique and diverse natural resources and maintain the character of its rural and semi-rural communities.  It reflects an environmentally sustainable approach to planning that balances the need for adequate infrastructure, housing, and economic vitality, while maintaining and preserving each unique community within the County, agricultural areas, and extensive open space." (Italics added.)  The GPU emphasizes *local* policies to reduce *local* GHG emissions:

> "The General Plan takes steps to address the challenging issue of climate change by reducing GHG emissions, retaining and enhancing natural areas, improving energy efficiency, reducing waste, recycling, and managing water use.  The General Plan will reduce GHG emissions primarily through minimizing vehicle trips and approving land use patterns that support increased density in areas where there is infrastructure to support it, increased opportunities for transit, pedestrians, and bicycles, and through green building and land development conservation initiatives.  Policies also address adaptation to climate change, such as continued wildfire management and protection, monitoring flood hazards, and regional collaboration on biological preservation, water use and supply, and other areas of concern."

31

To the extent GPAs emit GHG in the County, but mitigate those impacts by reducing emissions elsewhere, the CAP's projection of future GHG emission levels is not entirely consistent with the GPU's focus on reducing *in-County* GHG emissions.[19] The issue, therefore, is whether this is enough to invalidate the CAP as being inconsistent with the GPU.

A project need not conform perfectly to every general plan policy to be consistent with the general plan. (*Families Unafraid to Uphold Rural etc. County v. Board of Supervisors* (1998) 62 Cal.App.4th 1332, 1341.) The rule of general plan consistency is that the project "must be 'compatible with the objectives, policies, general land uses, and programs specified in' " the general plan. (*Sequoyah Hills*, *supra*, 23 Cal.App.4th at pp. 717-718.) "[C]ourts accord great deference to a local governmental agency's determination of consistency with its own general plan, recognizing that 'the body which adopted the general plan policies in its legislative capacity has unique competence to interpret those policies when applying them in its adjudicatory capacity. [Citations.] Because policies in a general plan reflect a range of competing interests, the governmental agency must be allowed to weigh and balance the plan's policies when applying them, and it has broad discretion to construe its policies in light of the plan's purposes. [Citations.] A reviewing court's role 'is simply to decide whether the [agency] officials considered the applicable policies and the extent to which the proposed project

---

[19]   See *post*, section II (F) for additional discussion of the impact of M-GHG-1 on the CAP.

32

conforms with those policies.' " (*San Franciscans Upholding the Downtown Plan v. City & County of San Francisco* (2002) 102 Cal.App.4th 656, 677-678.)

Here, GPU policies must also be construed in light of science. "[T]he global scope of climate change and the fact that carbon dioxide and other greenhouse gases, once released into the atmosphere, are not contained in the local area of their emission means that the impacts to be evaluated are also global rather than local." (*Center for Biological Diversity*, *supra*, 62 Cal.4th at pp. 219-220.) Thus, reducing or eliminating GHG emissions anywhere is a benefit.

Although the CAP is not perfectly in tune with the GPU, and in light of the highly deferential standard of review, we conclude the court erred in determining that the CAP is inconsistent with GPU policies. A "guiding principle" in the GPU is to "reduce greenhouse gas emissions that contribute to climate change." The GPU recognizes that the "sources, impacts, and solutions to climate changes are complex." The GPU contains a policy to "reduce GHG emissions *primarily* through minimizing vehicle trips and approving [sustainable] land use patterns . . . ." (Italics added.) The GPU provides that the "*primary* opportunities to reduce air quality pollutants and GHG emissions are in the urbanized areas of the County where there are land use patterns that can best support the increased use of transit and pedestrian activities . . . ." (Italics added.)

Plaintiffs' argument that the CAP is inconsistent with these goals would require replacing "primarily" with "exclusively." Moreover, the CAP is consistent with the GPU by providing measures to reduce VMT, recognizing that such measures are necessary to achieve the 2030 target. "[P]roposed transportation measures in the CAP focus on

33

reducing VMT through improved design of development, infrastructure improvements, travel demand management programs, parking code revisions, and alternative fuel use." "Several GHG reduction measures focus on reducing the number and length of single-occupancy vehicle trips (measures T-1.1, T-1.2, and T-1.3) and expanding alternative transportation opportunities (measures T-2.1, T-2.2, T-2.3, and T-2.4)." CAP measure T-2.1 reduces VMT by improving roadway segments, intersections, and bikeways to encourage pedestrian and cyclist trips. Another reduces VMT by encouraging alternative work schedules and telecommuting.

Additionally, the GPU provides that the CAP shall contain a "baseline inventory" of GHG emissions from all sources, GHG emissions reduction targets and deadlines, and enforceable GHG emissions reduction measures. The CAP complies by containing (1) a baseline inventory, (2) GHG reduction targets and deadlines, and 26 GHG reduction measures.

The GPU also contains a policy to reduce in-County and County operations GHG emissions to meet legislative targets. The CAP is consistent with this goal by adopting per capita reductions suggested by CARB to meet 2030 and 2050 targets.

To support a contrary result, Plaintiffs cite *Spring Valley Lake Assn. v. City of Victorville* (2016) 248 Cal.App.4th 91. There, a city's general plan required all new commercial development to generate electricity onsite to the maximum extent feasible. (*Id.* at p. 98.) The EIR for a proposed Walmart stated the project would be solar ready, and should a determination be made in the future that photovoltaic panels can deliver power there at a reasonable cost, Walmart and the city would negotiate adding solar

34

energy-generating facilities to the project. (*Ibid*.) On appeal, this court affirmed the trial court's finding that the project was not consistent with the general plan because the city "effectively found there was no extent to which it would be feasible to require the project to generate electricity onsite" and "there is no evidence in the record to support such a finding." (*Id.* at pp. 99-100.) In contrast here, however, the SEIR's finding that implementing the CAP would not be inconsistent with the 2011 GPU is supported by substantial evidence.

### E. *It is Unnecessary to Decide Whether M-GHG-1 Projects Are Consistent with the GPU*

In a related argument, Plaintiffs contend that GPAs using M-GHG-1 will be inconsistent with the GPU because M-GHG-1 allows in-County emissions to be mitigated with out-of-County offsets. It is unnecessary to decide this issue. As explained *post*, M-GHG-1 is not CEQA-compliant. Because M-GHG-1 fails on these grounds, it is unnecessary to decide whether M-GHG-1 is invalid for other reasons. (See *Communities for a Better Environment v. City of Richmond* (2010) 184 Cal.App.4th 70, 101-102 (*CBE*) [appellate court not required to address additional alleged defects that may be addressed in a completely different and more comprehensive manner upon subsequent CEQA review following remand].)

## II.

### *M-GHG-1 VIOLATES CEQA*

A. *The Trial Court's Ruling*

The superior court determined that M-GHG-1 violates CEQA by (1) "allow[ing] the use of offsets purchased anywhere on the planet, with no limit on geographic scope or duration (and no temporal or cumulative limit)"; (2) containing an "illusory" geographic priority because only one offset project exists in the County; and (3) requiring offsets be purchased from CARB-approved registries is "not remotely similar to the CARB program." Elaborating, the trial court noted that cap-and-trade offsets are generally limited to those occurring in the United States and may only be used to meet up to 8 percent of a participant's annual compliance obligations. However, M-GHG-1 has neither limitation. The court also stated there is no evidence that out-of-County offsets will be enforceable, verifiable, and of sufficient duration. The court further determined that M-GHG-1 lacks "standards or criteria" for achieving the Director's " 'satisfaction' " and for determining whether a registry is sufficiently "reputable" to substitute for the identified registries.

B. *CEQA Overview*

" 'The foremost principle under CEQA is that the Legislature intended the act "to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' " [Citations.] 'With narrow exceptions, CEQA requires an EIR whenever a public agency proposes to approve or to carry out a project that may have a significant effect on the environment.

[Citations.]'  The basic purpose of an EIR is to 'provide public agencies and the public in general with detailed information about the effect [that] a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.'  [Citations.]  'Because the EIR must be certified or rejected by public officials, it is a document of accountability.  If CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action with which it disagrees.'  [Citation.]  The EIR "protects not only the environment but also informed self-government.' "  (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 511-512 (*Sierra Club*).)  " ' "The EIR is the heart of CEQA," and the integrity of the process is dependent on the adequacy of the EIR.' "  (*Rialto Citizens for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899, 924.)

C.  *The Standard of Review*

The parties disagree about the applicable standard of review.  The County contends the CEQA issues are reviewed for abuse of agency discretion, and that the substantial evidence standard governs review of the County's "factual findings, conclusions, and determinations."  However, citing primarily *Sierra Club*, *supra*, 6 Cal.5th 502, Plaintiffs contend "[d]e novo is the correct standard of review" for the CEQA claims.

The applicable standard of review is more nuanced.  "[T]he appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial

37

review under CEQA is de novo."  (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427.)

The County's determinations as lead agency are reviewed for abuse of discretion. (*Sierra Club*, *supra*, 6 Cal.5th at p. 512.)  " '[A]n agency may abuse its discretion under CEQA either by failing to proceed in the manner CEQA provides or by reaching factual conclusions unsupported by substantial evidence.' "  (*Banning Ranch Conservancy v. City of Newport Beach* (2017) 2 Cal.5th 918, 935 (*Banning Ranch*).)

And within this abuse of discretion standard, review varies depending on the issue involved.  " 'While we determine de novo whether the agency has employed the correct procedures, "scrupulously enforc[ing] all legislatively mandated CEQA requirements" [citation], we accord greater deference to the agency's substantive factual conclusions.  In reviewing for substantial evidence, the reviewing court "may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable," for, on factual questions, our task "is not to weigh conflicting evidence and determine who has the better argument." ' "  (*Sierra Club*, *supra*, 6 Cal.5th at p. 512.)

In *Sierra Club*, the California Supreme Court summarized these principles as follows:  (1) An agency has considerable discretion in deciding the manner of discussing potentially significant effects in an EIR.  (2) However, a reviewing court must determine whether that discussion comports with an EIR's intended function. (3) This review is not solely a matter of discerning whether there is substantial evidence to support the agency's factual conclusions.  (*Sierra Club*, *supra*, 6 Cal.5th at pp. 515-516.)  For example, there are " 'instances where the agency's discussion of significant project impacts may

38

implicate a factual question that makes substantial evidence review appropriate,' such as an agency's decision to use a particular methodology. [Citation.] 'But whether a description of an environmental impact is insufficient because it lacks analysis or omits the magnitude of the impact is not a substantial evidence question.' [Citation.] Where the ultimate inquiry is whether an EIR omits material necessary to reasoned decisionmaking and informed public participation, the inquiry is predominantly legal and, '[a]s such, it is generally subject to independent review.' " (*Chico Advocates for a Responsible Economy v. City of Chico* (2019) 40 Cal.App.5th 839, 846-847.)

"The ultimate inquiry . . . is whether the EIR includes enough detail 'to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' " (*Sierra Club*, *supra*, 6 Cal.5th at p. 516.) "Generally, that inquiry is a mixed question of law and fact subject to de novo review, but to the extent factual questions . . . predominate, a substantial evidence standard of review will apply." (*South of Market Community Action Network v. City and County of San Francisco* (2019) 33 Cal.App.5th 321, 330-331 (*South of Market*).) " 'A prejudicial abuse of discretion occurs if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process.' " (*Id*. at p. 331.)

With these principles in mind, we turn to the CEQA issues.

D. *M-GHG-1 Violates CEQA Because Its Performance Standard
is Unenforceable*

1. *Introduction*

A mitigation measure is a change that would reduce or minimize the project's significant adverse environmental impact. (*No Slo Transit, Inc. v. City of Long Beach* (1987) 197 Cal.App.3d 241, 256.) " 'Mitigating conditions are not mere expressions of hope.' " (*Sierra Club I*, *supra*, 231 Cal.App.4th at p. 1167.) They must be enforceable through permit conditions, agreements, or other legally-binding instruments. (Pub. Resources Code, § 21081.6, subd. (b); Guidelines, § 15126.4, subd. (a)(2).)

Mitigation measures for GHG emissions may include "[o]ffsite measures, including offsets that are not otherwise required." (Guidelines, § 15126.4, subd. (c)(3).) The parties agree that offsets "can be a valuable GHG mitigation strategy" if "[p]roperly restricted" with "verified offsets." However, as the superior court remarked, "the devil is in the details."

Under section 38562, subdivision (d)(1) and (2), cap-and-trade offset credits may be issued only if the emission reduction achieved is "real, permanent, quantifiable, verifiable, enforceable, and additional to any GHG emission reduction otherwise required by law or regulation, and any other GHG emission reduction that otherwise would occur."

" 'Real' means . . . that GHG reductions . . . result from a demonstrable action or set of actions, and are quantified using appropriate, accurate, and conservative methodologies that account for all GHG emissions sources, GHG sinks, and GHG

40

reservoirs within the offset project boundary and account for uncertainty and the potential for activity-shifting leakage and market-shifting leakage."[20]  (Cal. Code Regs., tit. 17, § 95802.)  " 'Permanent' means . . . that GHG reductions . . . are not reversible, or when GHG reductions  . . .  may be reversible, that mechanisms are in place to replace any reversed GHG emission reductions  . . . to ensure that all credited reductions endure for at least 100 years."  (*Ibid.*)  " 'Quantifiable' means . . . the ability to accurately measure and calculate GHG reductions . . . relative to a project baseline in a reliable and replicable manner for all GHG emission sources . . . ."  (*Ibid.*)  " 'Verifiable' means that an Offset Project Data Report assertion is well documented and transparent such that it lends itself to an objective review by an accredited verification body."  (*Ibid.*)  " 'Additional' means . . . greenhouse gas emission reductions or removals that exceed any greenhouse gas reduction or removals otherwise required by law, regulation or legally binding mandate, and that exceed any greenhouse gas reductions or removals that would otherwise occur in a conservative business-as-usual scenario."  (Cal. Code Regs., tit. 17, § 95802.)

---

[20]     GHG sink means "a physical unit or process that removes a GHG from the atmosphere."  (Cal. Code Regs., tit. 17, § 95802.)  GHG reservoir means "a physical unit or component of the biosphere, geosphere, or hydrosphere with the capability to store, accumulate, or release a GHG removed from the atmosphere by a GHG sink or a GHG captured from a GHG emission source."  (*Ibid.*)  Leakage is an unintended increase in GHG emissions caused by a project.  " 'Market-shifting leakage,' in the context of an offset project, means increased GHG emissions or decreased GHG removals outside an offset project's boundary due to the effects of an offset project on an established market for goods or services."  (*Id.*, § 95102.)

The text of M-GHG-1 incorporates section 38562, subdivision (d)(1) by reference by stating, "Carbon offset credits must be purchased through [certain named registries or through] . . . any other reputable registry or entity that issues carbon offsets consistent with . . . section 38562(d)(1) . . . ."[21] Moreover, to demonstrate that M-GHG-1 is CEQA-compliant, the County invites comparison between M-GHG-1 and CARB-issued offset credits under cap-and-trade. Although conceding at oral argument that there are "some differences" between cap-and-trade offset credits and offset credits under M-GHG-1, the County contends cap-and-trade and M-GHG-1 are "substantially similar." Specifically, the County asserts that M-GHG-1 will be "effective and enforceable" because M-GHG-1 requires offsets to be purchased from registries that "meet the stringent requirements of . . . section 38562, subdivision (d)(1)."

Accordingly, we compare and contrast the "stringent requirements" in M-GHG-1 with those governing CARB offset credits under cap-and-trade.

### 2. *Cap-and-trade offset protocols*

The value of any offset depends on whether GHG emission reduction has occurred. "[U]nlike the produce at the farmer's market, we can't examine the [GHG offset] product to determine its value. Not only are emission reductions invisible, they actually *didn't happen*. So to have confidence in their value, we need a reliable and accurate picture of what *would have happened*, as well as what *actually happened*."

---

21    The County asserts that CEQA does not "import Health and Safety Code standards for Assem. Bill No. 32 . . ." It is unnecessary to address that issue because M-GHG-1 self-imposes these requirements.

42

(California Air Pollution Control Officers Association, Quantifying Greenhouse Gas Mitigation Measures (2010), p. 22 (*CAPCOA Quantifying*), italics in original.)

"Protocols are the formalized procedures for accounting for credits that ensure the credits are an accurate and reliable representation of emission reductions that actually occurred."  (*CAPCOA Quantifying*, *supra*, at p. 22.)  Protocols " 'qualify and quantify GHG destruction, ongoing GHG reductions or GHG removal enhancements achieved by an offset project.' "  (*Our Children's Earth Foundation v. State Air Resources Bd.* (2015) 234 Cal.App.4th 870, 879 (*Our Children's*).)

Under cap-and-trade, an offset project must use a CARB-approved "Compliance Offset Protocol"  (CARB Protocol).  (Cal. Code Regs., tit. 17, § 95973, subd. (a)(1).) CARB Protocols are designed to "ensure that the reductions are quantified accurately, represent real GHG emissions reduction, and are not double-counted within the system." More specifically, a CARB Protocol must:

> "(1) Accurately determine the extent to which GHG emission reductions and GHG removal enhancements are achieved by the offset project type;

> "(2) Establish data collection and monitoring procedures relevant to the type of GHG emissions sources, GHG sinks, and GHG reservoirs for that offset project type[];

> "(3) Establish a project baseline that reflects a conservative estimate of business-as-usual performance or practices for the offset project type;

> "(4) Account for activity-shifting leakage and market-shifting leakage for the offset project type, unless the Compliance Offset Protocol stipulates eligibility conditions for use of the Compliance Offset Protocol that eliminate the risk of activity-shifting and/or market-shifting leakage;

43

"(5) Account for any uncertainty in quantification factors for the offset project type;

"(6) Ensure GHG emission reductions and GHG removal enhancements are permanent;

"(7) Include a mechanism to ensure permanence of GHG removal enhancements for sequestration offset project types;

"(8) Establish the length of the crediting period pursuant to [California Code of Regulations, title 17,] section 95972[, subdivision] (b) for the relevant offset project type; and

"(9) Establish the eligibility and additionality of projects using standard criteria, and quantify GHG reductions and GHG removal enhancements using standardized baseline assumptions, emission factors, and monitoring methods." (Cal. Code Regs., tit. 17, § 95972.)

A CARB Protocol must also specify the project's geographic boundary. Generally, that boundary must be within the United States or its territories. (Cal. Code Regs., tit. 17, § 95972, subd. (c).)[22] Also, the project must employ procedures specified in the CARB Protocol "for monitoring measurements and project performance . . . ." (*Id.*, § 95976, subd. (a).)

There are currently six CARB Protocols. (Cal. Code Regs., tit. 17, § 95975, subd. (e).) Each is from a distinct economic sector outside the coverage of cap-and-trade. (*Ibid.*) For example, the livestock protocol authorizes offset credits for projects that reduce methane emissions. (*Our Children's*, *supra*, 234 Cal.App.4th at p. 880.)

---

22    In this respect, the County's assertion at oral argument that cap-and-trade has no "geographic preferences" is incorrect.

Cap-and-trade offsets must also be *additional*. This means that the offset project must "exceed any [GHG] reduction or removals otherwise required by law, regulation, or legally binding mandate." The offset must also exceed what would have otherwise occurred "in a conservative business-as-usual scenario." (Health & Saf. Code, § 38562, subd. (d)(1) & (2); Cal. Code. Regs., tit. 17, § 95802, subd. (a)(4).)[23] For example, the ozone depleting substances protocol excludes destruction of such substances by the United States government because such " 'is common practice and considered business-as-usual. . . .' " (*Our Children's*, *supra*, 234 Cal.App.4th at p. 881.)

A CARB Protocol must " '[e]stablish [] the eligibility and additionality of projects using standard criteria, and quantif[y] GHG reductions and GHG removal enhancements using standardized baseline assumptions, emission factors, and monitoring methods.' [Citation.] Furthermore, a specific project may qualify for an offset credit only by meeting both the additionality requirements set forth in the regulation and any additionality requirements in the applicable [CARB] [P]rotocol." (*Our Children's*, *supra*, 234 Cal.App.4th at p. 878.)

---

[23] " 'Conservative' means . . . utilizing project baseline assumptions, emission factors, and methodologies that are more likely than not to understate net GHG reductions or GHG removal enhancements for an offset project to address uncertainties affecting the calculation or measurement of GHG reductions or GHG removal enhancements." (Cal. Code Regs., tit. 17, § 95802, subd. (a)(77).) " 'Business-as-Usual Scenario' means the set of conditions reasonably expected to occur within the offset project boundary in the absence of the financial incentives provided by offset credits, taking into account all current laws and regulations, as well as current economic and technological trends.' " (*Id.*, subd. (a)(43).)

CARB Protocols are regulatory documents. Therefore, CARB must "provide public notice of and opportunity for public comment prior to approving any [CARB] Protocols . . . ." (Cal. Code Regs., tit. 17, § 95971, subd. (a).)

After issuing offset credits, CARB may invalidate them if newly discovered information shows the Protocol was noncompliant. (Cal. Code Regs., tit. 17, § 95985, subd. (c).)

Offset projects in foreign countries present additional concerns. "With domestic offsets, the offset developer and capped source purchaser are within [CARB's] jurisdiction. Regulations have been adopted that assure that if an offset is false, fails or otherwise is inadequate that [CARB] can take enforcement action.' [CARB] can rely upon existing monitoring, inspections and other tools that an enforcement agency has available to it. An international offset in a developing country is inevitably dependent upon the host country or third parties to validate the activities giving rise to the offset. Corruption at any stage in the development of the offset, from the initial reporting to the verification and monitoring will undermine the offset." (Alan Ramo, The California Offset Game: Who Wins and Who Loses, 20 Hastings W.-Nw. J. Envt'l L. & Pol'y 109, 147 (2014) (*Ramo Offset*).)

California's cap-and-trade program includes several additional requirements for out-of-state and foreign offsets. This process is called "linkage." (Gov. Code, § 12894, subd. (e).)

Before linking with another jurisdiction's offset program, CARB must notify the Governor, who has 45 days in which to consider advice from the Attorney General, and

make (or decline to make) the following findings that are submitted to the Legislature: (1) The other jurisdiction's GHG emissions program must be "equivalent to or stricter than" California's program; (2) California must retain the ability to enforce Assem. Bill No. 32 requirements against any entity subject to regulation under those statutes, and against any entity located within the other jurisdiction to the maximum extent permitted under the United States and California Constitutions; (3) the other jurisdiction must have equivalent or stricter enforcement powers; and (4) the proposed linkage does not impose any liability on California. (Gov. Code, § 12894, subds. (f) & (g).)[24]

### 3. *Registries*

An Offset Project Registry (Registry) is "an entity that . . . is approved by [C]ARB that lists offset projects, collects Offset Project Data Reports, facilitates verification of Offset Project Data Reports, and issues registry offset credits for projects being implemented using a CARB Protocol." (Cal. Code Regs., tit. 17, § 95802.) However, to obtain a CARB offset credit, it is not enough for a Registry to issue credit. CARB alone determines whether a registry offset qualifies as a compliance instrument. (*Id.*, §§ 95802 [defining registry offset credit], 95981.1 [process for issuing CARB offset credits].)

### 4. *M-GHG-1 is not equivalent to cap-and-trade offsets*

The County contends that M-GHG-1 is "substantially similar" to the offset program authorized under cap-and-trade. Specifically, the County asserts that like offsets

---

[24] Sierra Club's request for judicial notice of CARB's website discussing linkage is denied as irrelevant. (*SDOG*, *supra*, 13 Cal.App.5th at p. 90, fn. 8.)

under cap-and-trade, M-GHG-1 requires offsets "be purchased from a registry approved by [C]ARB or one that meets section 38562[, subdivision (d)(1)]."  The County argues that this is a "sufficient safeguard[]" to "ensure credits purchased pursuant to M-GHG-1 are real, permanent, verifiable, and enforceable."

However, M-GHG-1 is materially different from Assem. Bill No. 32 compliant cap-and-trade offsets in several key respects.  Under M-GHG-1, offsets must be purchased through "(i) a CARB-approved registry, such as the Climate Action Reserve, the American Carbon Registry, and the Verified Carbon Standard, (ii) any registry approved by CARB to act as a registry under the state's cap-and-trade program, (iii) through the CAPCOA GHG Rx and SDAPCD, or (iv) if no registry is in existence as identified . . . above, then any other reputable registry or entity that issues carbon offsets consistent with . . . section 38562 [subdivision] (d)(1), to the satisfaction of the Director . . . ."[25]  At oral argument, the County explained that it is "through the use of those registries that the protocol gets applied."  But M-GHG-1 says nothing about the protocols that the identified registries must implement.  Therefore, implicit in the County's argument is that if the registry administering the offset is CARB-approved, then for that reason alone, *necessarily* the GHG emissions reduction protocol administered by that agency is also Assem. Bill No. 32 compliant, thereby ensuring the validity of the offset credit claimed.  However, this assumption is incorrect.

---

25    CAPCOA GHG Rx is the California Air Pollution Control Officers Association Greenhouse Gas Reduction Exchange.  APCD is the Air Pollution Control District.

Unlike M-GHG-1, under cap-and-trade, it is not enough that the registry be CARB-approved. Equally important, the protocol itself must be CARB-approved. (Cal. Code Regs., tit. 17, § 95970, subd. (a)(1) & (2).)[26] *This distinction is significant because some offset protocols administered by CARB-approved registries are not Assem. Bill No. 32 compliant.* Indeed, CARB has stated that offset protocols developed by CARB-approved registries (including registries named in M-GHG-1) do *not by that fact alone* meet the offset criteria in Assem. Bill No. 32:

> "Voluntary offset programs such as the American Carbon Registry, Climate Action Reserve, Verified Carbon Standard, and others may submit protocols to [C]ARB for review. However, regardless of how the voluntary protocols are developed, [C]ARB staff must determine whether the voluntary protocol should be developed for use in the Cap-and-Trade Program and if so, to conduct its own rulemaking process under the Administrative Procedure Act. . . . *This process ensures that any voluntary protocol . . . demonstrates the resulting reductions meet the offset criteria in [Assem. Bill No. 32] . . . .*

> "Protocols developed by the voluntary programs are not Compliance Offset Protocols as they are not developed through a rulemaking process, *may not meet the [Assem. Bill No. 32] and Cap-and-Trade Regulation criteria,* and were not approved by [CARB]." (Italics added.)

Furthermore, before approving a protocol, CARB subjects the proposed offset protocol to public notice, a comment period, and a public hearing. (Cal. Code Regs., tit. 17, §§ 95970, subd. (a)(2), 95971, subd. (a).) CARB also requires that emission reductions for offset credit be from sources not already covered by cap-and-trade. For

---

[26] "A registry offset credit must . . . [r]esult from the use of a Compliance Offset Protocol . . . ." (Cal. Code Regs., tit. 17, § 95970, subd. (a)(2).)

example, CARB would not approve an offset protocol for installing solar panels because electricity generation is already covered under cap-and-trade.

The CARB Protocols are the heart of cap-and-trade offsets—but the word "protocol" is not even mentioned in M-GHG-1. Contrary to the County's contention, M-GHG-1 is not equivalent to cap-and-trade offset programs because M-GHG-1 does not require the protocol itself to be consistent with CARB requirements under title 17, section 95972, subdivision (a)(1)-(9) of the California Code of Regulations, quoted *ante*. For example, CARB will not approve a protocol unless its GHG reductions are permanent. (*Id.*, § 95970, subd. (a)(1).) If the project is to sequester carbon (e.g., planting trees), the protocol must ensure that the GHG will not be released for 100 years. M-GHG-1 is deficient because it has no such safeguards.

Under cap-and-trade, legislative safeguards seek to ensure that out-of-state offsets reflect genuine GHG reductions. For example, CARB may approve out-of-state offsets only if the Governor makes findings to ensure the linked jurisdiction's offsets are genuine, verifiable, and enforceable under law that is at least as strict and enforceable as is California law. (Gov. Code, § 12894, subd. (f).) However, M-GHG-1 has no such restrictions. The only M-GHG-1 limit on mitigating with international offsets is the Director's unilateral decision that offsets are not feasibly available within (1) the unincorporated county; (2) the County; (3) California; and (4) the United States. The fundamental problem, unaddressed by M-GHG-1, is that the County has no enforcement authority in another state, much less in a foreign country. M-GHG-1 does not require a

50

finding that an out-of-state offset site has laws at least as strict as California's with respect to ensuring the validity of offsets.

At oral argument, the County asserted that the "registries" would be the County's enforcement mechanism to ensure the validity of offsets originating in foreign countries. This argument fails, however, because it is premised on the assumption that the registry's protocol is Assem. Bill No. 32 compliant—and as explained *ante*, M-GHG-1 does not require use of an Assem. Bill No. 32 compliant protocol.

Moreover, nothing other than the Director's determination of feasibility limits a GPA applicant from obtaining up to 100 percent of its GHG emission reductions through M-GHG-1 offsets. This includes offset projects occurring anywhere in the world. In sharp contrast, cap-and-trade offsets cannot exceed *8 percent* of an entity's entire compliance obligation. (Cal. Code Regs., tit. 17, § 95854, subd. (b).)[27]

The relative ease with which GPAs might obtain offset credits originating in foreign countries under M-GHG-1 is particularly concerning because "[i]n a developing country where one relies upon records that may not exist, and testing technology that may be inadequate or fraudulent, it can be difficult if not impossible" to verify GHG reductions. (*Ramo Offset*, *supra*, 20 Hastings W.-Nw. J. Envt'l L. & Pol'y at p. 121.) "Beyond these challenges is the issue of what would have happened anyway. A developing country is so named because it is economically underdeveloped and is

---

[27]    We express no opinion on whether 8 percent is also the CEQA limit. That issue is not before us.

51

hopefully making economic and social progress. In that climate, how does one distinguish between an emission reduction that would have happened anyway and one that is happening only or in part because of the encouragement of the offset program and the potential to sell a credit for a profit?" (*Ibid*.) "Corruption also presents challenges . . . . [As of 2011], [t]here [were] . . . carbon reduction projects either certified or under development in Ethiopia, Nicaragua, the Philippines, Kenya, and Venezuela. Yet, Transparency International's Global Corruption Report 2009 rates Ethiopia as the 126th most corrupt country out of 180 countries, Nicaragua as the 134th, the Philippines as the 141st, Kenya as the 147th, and Venezuela as the 158th." (Brian Joseph McFarland, *Carbon Reduction Projects and the Concept of Additionality* (2011) 11 Sustainable Dev. L. & Pol'y 15, 16 (*McFarland*), fn. omitted.)

There is another significant deficiency in M-GHG-1. Under cap-and-trade, GHG emission reductions must be *additional* "to any greenhouse gas emission reduction otherwise required by law or regulation, and any other greenhouse gas emission reduction that otherwise would occur." (§ 38562, subd. (d)(2).) "Additionality is an important requirement because if non-additional (i.e., 'business-as-usual') projects are eligible for carbon [offset] . . . then the net amount of greenhouse gas emissions will continue to increase and the environmental integrity of carbon reduction projects will be called into question." (*McFarland*, *supra*, 11 Sustainable Dev. L. & Pol'y at p. 15.) For example, CARB will not approve a protocol that "includes technology or GHG abatement practices that are already widely used." Moreover, "[t]o assess if a specific GHG mitigation method may have 'otherwise occurred,' " CARB will determine "if that method is

52

common practice in the geographic area in which the proposed [CARB Protocol] is applicable."

Although additionality is "a critical component of any environmental market" it is "often seen as expensive [and] onerous. . . ."  (Karen Bennett, *Additionality:  The Next Step for Ecosystem Service Markets* (2010) 20 Duke Envt'l. L. & Pol'y F. 417, 419.) Perhaps this explains why M-GHG-1 seemingly goes out of its way to *not* require additionality.

Under M-GHG-1, the Director may approve offsets issued by any "reputable registry or entity that issues carbon offsets consistent with . . . section 38562[, subdivision] (d)(1)."  The County asserts this reference to section 38562 ensures that offset protocols administered under M-GHG-1 will be substantially similar to Assem. Bill No. 32 compliant offsets.  However, subdivision (d)(1) of section 38562 does not require that offsets be additional.  Additionality is required under the next subdivision [(d)(2)] in section 38562, which provides in part:

> "Any regulation adopted by [CARB] . . . shall ensure all of the
> following:  [¶] . . . [¶]  (2)  . . . the reduction is in addition to any
> greenhouse gas emission reduction otherwise required by law or
> regulation, and any other greenhouse gas emission reduction that
> otherwise would occur."  (§ 38562, subd. (d)(2).)

Although M-GHG-1 cites subdivision (d)(1) of section 38562, it is silent with respect to subdivision (d)(2).  And there is nothing else in M-GHG-1's text that requires

additionality.[28]  At oral argument, when asked to identify the language *in* M-GHG-1 that requires "additionality," the County's lawyer cited a portion of the SEIR that states, "One carbon offset credit represents the past reduction or sequestration of one metric ton of carbon dioxide equivalent that is '*not otherwise required*' (CEQA Guidelines section 15126.4 [subdivision] (c)(3))."  (Italics added.)  Later, however, counsel correctly conceded that "not otherwise required" is *not* in the text of M-GHG-1.  Rather, it is in a prefatory section of the SEIR about greenhouse gas emissions, prior to the text of M-GHG-1 itself.

In comments to the DSEIR, Golden Door's attorneys called the County's attention to these problems.  In response, the County did not claim that additionality was not required.  Rather, the County asserted that M-GHG-1 offsets would be additional by "adher[ing] to the applicable protocol, as detailed in SEIR Appendix B."  In its reply brief, the County makes the same assertion, stating:  "Appendix B to the SEIR contains nearly 3,000 pages of offset protocols that the registries listed in M-GHG-1 use to ensure that offsets meet rigorous standards showing they are . . . additional, and verifiable . . . ."

The problem with this argument is that Appendix B itself states that it does not apply to M-GHG-1.  Rather, Appendix B applies to CAP reduction measure T.-4.1.  Appendix B is entitled "Range of *Direct Investment* Protocols."  (Italics added.)  The

---

28    In its reply brief, the County glosses over this deficiency by asserting that under M-GHG-1, "a registry must meet the requirement of . . . section § [*sic*] 38562 . . . ."  However, the text of M-GHG-1 invokes only subdivision (d)(1) of that statute, not subdivision (d)(2).

direct investment program is GHG reduction measure T-4.1 in the CAP. As explained *ante*, under T-4.1, the County may invest in projects in the County that reduce or eliminate in-County GHG emissions. The SEIR explains, "Appendix B of this Draft SEIR provides a range of protocols that may be applied to County direct investment projects to implement GHG Reduction Measure T-4.1." Elsewhere in its response to comments, the County similarly states, "Appendix B provides support for the County's local direct investment projects through CARB-approved protocols. . . . *Appendix B applies only to how the County will ensure tracking and enforceability of GHG Reduction Measure T-4.1.*" (Italics added.) In response to another comment, the County added, "The performance-based protocols listed in CAP SEIR Appendix B will be used to develop project-level detail for implementing GHG Reduction Measure T-4.1 . . . ." At oral argument, the County had no response to this point.

Thus, although nothing appears to preclude a GPA project from using an Appendix B protocol as part of its M-GHG-1 mitigation—nothing in M-GHG-1 *requires* it. By insisting that M-GHG-1 requires additionality because it requires GPAs to use Appendix B protocols, the County actually highlights one of M-GHG-1's most significant flaws—offset credits under M-GHG-1 need not be additional.[29]

---

29    In this litigation, Plaintiffs have not challenged any of the Appendix B protocols. Therefore, for future reference they are:
    *CAPCOA GHG Rx protocols*:  (a) Biomass Waste for Energy Project (2013); (b) Coastal Wetland Creation Version 1.0 (2016); (c) Compost Additions to Grazed Grasslands (2014); (d) Forestry Protocol #1 (2013); (e) Forestry Protocol # 2 (2013);

55

### 5. *The County's arguments that M-GHG-1 is enforceable lack merit*

The County also contends that M-GHG-1 is effective and enforceable because it "perfectly conforms" to a "discussion draft" on carbon offsets prepared by the Governor's Office of Planning and Research (OPR). However, this document is not part of the record and we deny the County's judicial notice request. (*Moore v. City of Los Angeles* (2007) 156 Cal.App.4th 373, 386 [review of administrative proceeding is limited to matters contained within the administrative record].)

In any event, the OPR document on its face states it is a "draft" containing "initial thoughts." To the extent the document has any probative value, it states that offsets are a "permissible way to mitigate climate change impacts under CEQA." Plaintiffs do not challenge that point. The issue is whether M-GHG-1 does so in a CEQA-compliant manner, which the OPR document does not address.

---

(f) Forestry Protocol #3 (2013); (g) Revised Livestock Projects (2014); (h) U.S. Livestock version 4.0 (2017); (i) Organic Waste Digestion (2017); (j) Weatherization of Single Family and Multi-Family Buildings (2016); (k) Wetland Implementation and Rice Cultivation in the Sacramento-San Joaquin Delta, San Francisco Estuary and the Coast of California Version 1.0 (2016);
*Climate Action Reserve protocols*: (a) Coal Mine Methane Version 1.1; (b) Forest Version 4.0 (2017); (c) Grassland Version 2.0 (2017); (d) Landfill Version 4.0 (2011); (e) U.S. Livestock Version 4.0; (f) Nitric Acid Production Version 2.1; (g) Nitrogen Management Version 1.1; (h) Organic Waste Composting Version 1.1; (i) Urban Forest Management Version 1.0 (2014); (j) Urban Tree Planting Version 2.0 (2014); (k) U.S. Ozone Depleting Substances Version 2.0;
*CARB protocols*: (a) U.S. Forest Projects (2015); (b) Livestock Projects Capturing and Destroying Methane from Manure Management Systems (2014); (c) Mine Methane Capture Projects Capturing and Destroying Methane From U.S. Coal and Trona Mines (2014); (d) Ozone Depleting Substances Projects Destruction of U.S. Ozone Depleting Substances Banks (2014) ; (e) Urban Forest Projects (2011).

The County also contends that the Newhall Ranch Resource Management and Development Plan (Newhall) is an "example of the type of project that helps the state achieve its emission reduction goals." The County claims that the Newhall plan relies on carbon offsets "from anywhere in the world for approximately 50 percent of its GHG emission reductions . . . ." The County concludes, therefore, that statewide emissions reductions "can be accomplished by reductions that occur out-of-state."

However, comparing M-GHG-1 to Newhall's GHG mitigation measures serves only to demonstrate M-GHG-1's severe deficiencies. In Newhall, GHG mitigation measures included requirements that (1) homes, commercial buildings, and public facilities create as much energy as is used by implementing energy-efficient design and renewable energy generation, such as solar panels; (2) every home (up to 21,500) be equipped with an electric vehicle charging station; (3) 2,000 onsite charging stations be installed in commercial and community areas; (4) subsidies for electric vehicle purchases be provided; (4) electric school bus and neighborhood electric vehicle programs, transit subsidies, tech-enabled mobility features, bike-share and car-share programs be provided; and (5) energy efficient upgrades for schools and public buildings in disadvantaged communities be constructed. M-GHG-1 contains none of these measures.

Moreover, Newhall's GHG mitigation identified "Direct Reduction Activities" that "are prototypical" of GHG reduction measures the developer would implement. These included (1) conservation of forest land to sequester GHG emissions; (2) funding clean burning cook stoves for underprivileged households in foreign countries (more than three billion people globally depend on burning wood fuels in archaic stone fires; a single clean

57

cook stove can save about two $MTCO_2e$ per year); and (3) programs for methane capture. M-GHG-1 identifies no specific GHG offset protocols to be implemented.

Further, "to ensure environmental integrity," the Newhall GHG mitigation plan required that any reduction or elimination be additional. It also defined additional using both a legal requirement test and a performance test.[30] As already explained, the text of M-GHG-1 does not require additionality.

Moreover, the County is incorrect in claiming that Newhall's GHG mitigation plan allowed carbon offsets "anywhere in the world for approximately 50 percent of its GHG emission reductions." Actually, in Newhall at least 68 percent of project GHG emissions reductions were required to be achieved in California. Moreover, at least *80 percent* were required to be achieved in the United States. In Newhall, even the possibility of 20 percent international offsets was reduced by requiring the developer to continue seeking reasonable opportunities to obtain domestic offsets. M-GHG-1 has no similar limits on international offsets.

And finally, in Newhall if the lead agency determines within 90 days that offsets are noncompliant with performance standards, permitting ceases until that agency

---

30    The legal-requirement test requires that the activity "shall not be required for GHG reduction by applicable law (i.e., statute, ordinance or regulation) in effect at the time of the initiation" of the activity. The performance test requires that the activity "shall reduce GHG emissions below the applicable common industry practice for GHG reductions as in effect at the time" the activity is initiated. The performance test for a particular activity "shall be set in a protocol by an [a]pproved [r]egistry through analysis of standard practices and technology deployment in the applicable industry sector."

determines the standards have been met.  Once again, M-GHG-1 has no safeguards for after-acquired information invalidating a previously issued offset.

For the first time in its reply brief, the County also contends that M-GHG-1 reductions would be "additional" because the County "would not permit a project applicant to mitigate . . . with out-of-County offsets until the applicant has exhausted the project's onsite and in-County options.  By not raising this in its opening brief, the County has forfeited the point.  (*Doe v. California Dept. of Justice* (2009) 173 Cal.App.4th 1095, 1115 (*Doe*) [" ' "Obvious considerations of fairness in argument demand that the appellant present all of his points in the opening brief.  To withhold a point until the closing brief would deprive the respondent of his opportunity to answer it or require the effort and delay of an additional brief by permission." ' "].)  Moreover, even if we were to consider this argument, it fails because it is based on a fundamental misunderstanding.  Additionality is not a geographic limitation, but rather considers whether the offset would have otherwise occurred.

Again for the first time in its reply, citing *Our Children's*, *supra*, 234 Cal.App.4th at page 882, the County contends that GHG emission reductions under M-GHG-1 are additional because they "would be additional to other legislatively-mandated reductions as assured by compliance with [s]ection 38562."  This point is also forfeited.  (*Doe*, *supra*, 173 Cal.App.4th at p. 1115.)  Moreover, as explained *ante*, M-GHG-1 does not invoke subdivision (d)(2) of section 38562.  The offset program analyzed in *Our Children's* does.  (*Our Children's*, at p. 877.)

E.  *M-GHG-1 Violates CEQA By Improperly Deferring Mitigation*

Under M-GHG-1, the Director determines whether to approve offset credits.  That decision is based on two determinations.  First, the registry or issuing entity must be CARB-approved or "reputable" and issue offsets consistent with section 38562, subdivision (d)(1).  Second, the offsets must not be "available" and/or not "financially feasible" in a location closer to the County as listed in the geographical hierarchy.  Plaintiffs contend that M-GHG-1 violates CEQA by improperly delegating and deferring mitigation to these future determinations.  We agree.

"Formulation of mitigation measures shall not be deferred until some future time." (Guidelines, § 15126.4, subd. (a)(1)(B).)  However, the specific details of a mitigation measure . . . may be developed after project approval when it is impractical or infeasible to include those details during the project's environmental review provided that the agency (1) commits itself to the mitigation, (2) adopts specific performance standards the mitigation will achieve, and (3) identifies the type(s) of potential action(s) that can feasibly achieve that performance standard and that will considered, analyzed, and potentially incorporated in the mitigation measure."  (*Ibid.*; see also *Forest Foundation*, *supra*, 17 Cal.App.5th at pp. 442-443.)  Where an EIR improperly defers mitigation, the approving agency abuses its discretion by failing to proceed as required by law.  (*CBE*, *supra*, 184 Cal.App.4th at pp. 89-90.)

Citing *Oakland Heritage Alliance v. City of Oakland* (2011) 195 Cal.App.4th 884 (*Oakland Heritage*), the County contends that M-GHG-1 is "similar to mitigation measures upheld by courts that require plans or purchasing of offsets subject to review

60

and approval by an agency official."  In *Oakland Heritage*, the appellate court upheld a mitigation measure deferring site-specific earthquake mitigation measures.  However, the EIR in *Oakland Heritage* required the developer to submit a design level investigation for each parcel that would "be in accordance with applicable City ordinances and policies and consistent with the most recent version of the California Building Code, which requires structural design that can accommodate ground accelerations expected from known active faults."  (*Id.* at p. 889.)  The EIR also required that the design level investigation would be reviewed by a structural engineer, a registered geotechnical engineer, and submitted to "the City Building Services Division . . . 'to ensure compliance with the applicable requirements of the geotechnical investigation as well as other applicable code requirements.' "  (*Id.* at p. 894.)  The EIR further contained "an extensive discussion of the mandates of various state and [c]ity laws bearing upon seismic safety, including the Seismic Hazards Mapping Act [citation], the Building Code . . ., and various City ordinances."  (*Id.* at p. 892.)  The EIR concluded that " '[c]onsidering the rigorous investigation process required under the engineering standard of care, compliance with state laws and local ordinances, and regulatory agency technical reviews, the mitigation measures . . . will reduce the risk of seismic hazards and ensure that impacts associated with development [of the] . . . Project area would remain less than significant.' "  (*Id.* at p. 910.)

*Oakland Heritage* concluded that the EIR sufficiently addressed potential environmental impacts associated with seismicity.  The court noted that the EIR "discussed the statutes and regulations aimed at increasing seismic safety."  (*Oakland*

61

*Heritage*, *supra*, 195 Cal.App.4th at p. 907.) The EIR also "discussed the responsibilities of the engineers and building officials and the processes to ensure that site investigations, grading, and construction are completed in accordance with the laws designed to protect the public and property from the effects of earthquake shaking and ground failure." (*Id.* at pp. 908-909.)

Contrary to the County's assertions, the mitigation measure in *Oakland Heritage* is materially distinguishable from M-GHG-1. In *Oakland Heritage*, the delegation to staff was based on objective statutory standards. In contrast here, M-GHG-1 provides only a generalized goal of no increase or net zero GHG emissions, and then allows the Director to determine whether any particular offset program is acceptable based on unidentified and subjective criteria.

Deferred mitigation violates CEQA if it lacks performance standards to ensure the mitigation goal will be achieved. For example, in *CBE*, *supra*, 184 Cal.App.4th 70, the appellate court struck down deferred mitigation for GHG emissions reduction because the mitigation measure "merely propose[d] a generalized goal of no net increase in greenhouse gas emissions and then set[] out a handful of cursorily described mitigation measures for future consideration that might serve to mitigate the 898,000 metric tons of emissions resulting from the Project." (*Id.* at p. 93.) The mitigation measures were undefined, and "[t]he only criteria for 'success' of the ultimate mitigation plan" was "the subjective judgment of the City Council, which presumably will make its decision outside of any public process a year after the Project has been approved." (*Ibid.*) The mitigation plan in *CBE* violated CEQA because it "offered no assurance that the plan for

how the [p]roject's greenhouse gas emissions would be mitigated to a net-zero standard was both feasible and efficacious . . . ."  (*Id*. at p. 95.)

M-GHG-1 violates CEQA in much the same ways as did the deferred mitigation plan addressed in *CBE*.  As there, M-GHG-1 sets a generalized goal—no net increase or net-zero GHG emissions.  And also like *CBE*, achieving that goal depends on implementing unspecified and undefined offset protocols, occurring in unspecified locations (including foreign countries), the specifics of which are deferred to those meeting one person's subjective satisfaction.

*Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777 (*Endangered Habitats*) is another instructive example of improper deferred mitigation.  There, the EIR required an acoustical report to demonstrate structures were designed to meet noise standards "satisfactory to the manager of the county's building permit division."  (*Id*. at pp. 793-794.)  The Court of Appeal held this violated CEQA because it "does no more than . . . allow approval by a county department without setting any standards."  (*Id.* at p. 794.)

Like the improper deferred mitigation plans in *CBE* and *Endangered Habitats*, M-GHG-1 contains no objective standards for determining whether any particular offset project is "available" and "financially feasible" in one location or another.  Without any objective and measurable standard for what "feasible" onsite reductions consist of, M-GHG-1 provides no reasonable assurance that any onsite GHG reduction will actually occur.

63

This concern is not merely theoretical. The County has approved GPAs using GHG mitigation measures similar to M-GHG-1 that will use a staggering amount of offsite carbon credits. For example, the County-approved Newland Sierra project planned to mitigate 82 percent of its GHG emissions with offsite offsets.[31]

Especially troubling is that M-GHG-1 contains no objective standards for the Director to apply in determining whether offsets originating in foreign countries are real, permanent, verifiable, enforceable, and additional. As one commentator notes, the ordinary challenges in establishing that a domestic offset protocol meets these standards are magnified in foreign countries:

> "The main motivation in encouraging offsets in developing countries is the enhancement of forests. The question becomes, what is the business-as-usual scenario in a situation when deforestation, the destruction of forests, is business as usual? If a lowering of the rate of deforestation is considered an emissions reduction, all that means is less trees are being cut down. This is a far cry from the [C]ARB's domestic Urban Forest Protocol using a performance standard of a net gain in trees. Until there is actually an increase in trees, the ability to remove carbon continues to decline and yet offsets can be rewarded." (*Ramo Offset*, *supra*, 20 Hastings W.-Nw. J Envt'l L. & Pol'y at p. 149.)

The administrative record in this case echoes some of these same concerns, stating, "The complexity of the offset program . . . is certain to result in some inaccuracy, and potentially in fraud. These uncertainties are one of the reasons that CARB limits the use of offsets in the Cap-and-Trade program to no more than 8 [percent] of the total."

_____

31    In March 2020, a majority of the electorate voted to repeal the Board of Supervisors' amendment of the General Plan associated with the Newland Sierra project.

However, under M-GHG-1, the Director's findings of unavailability and feasibility could allow a GPA applicant to offset all project GHG emissions through credits originating in foreign countries.

M-GHG-1 also entrusts to the "satisfaction of the Director" whether the proposed offset registry is "reputable" and the protocol being implemented by the registry is "consistent" with section 38562, subdivision (d)(1)—that is, whether the projected GHG reductions are "real, permanent, verifiable and enforceable." However, M-GHG-1 has no objective criteria for making such findings.[32] In contrast, to ensure that GHG reductions are real, CARB requires the reduction be "a direct reduction within a confined project boundary." Thus, "[r]ecycling activities would not be eligible for offset credit as the recycling activities do not have a direct GHG reduction at the recycling facility. . . ." M-GHG-1 contains no similar standards. To ensure permanency, CARB requires there be "no opportunity for a reversal of the avoided emissions." This is implemented, for example, in CARB's forestry protocol, which requires sequestering carbon "for at least 100 years." But M-GHG-1 lacks any permanency criteria. To ensure emissions reductions are additional, CARB will not approve a protocol "for a project type that

---

[32] At oral argument, the County asserted that objective criteria guides the Director's discretion under M-GHG-1 because there must be "sufficient credits"—i.e., an amount of carbon offsets to result in a GPA project having zero GHG emissions above the CAP. It is undoubtedly true that determining the amount of GHG reductions needed to obtain net zero is objective because it is a mathematical calculation. However, this begs the question whether the calculated GHG emissions reduction will actually be obtained. That is determined by the validity of the protocol being implemented, and M-GHG-1 does not require Assem. Bill No. 32 compliant protocols.

includes technology or GHG abatement practices that are already widely used." However, M-GHG-1 contains no such objective criteria.

It is true that M-GHG-1 establishes a goal of no net increase above the CAP's GHG emission projections. However, courts have invalidated deferred mitigation measures having similar generalized goals that lack performance standards. (*CBE*, *supra*, 184 Cal.App.4th at p. 93 [no "net increase" in GHG emissions]; *Gray v. County of Madera* (2008) 167 Cal.App.4th 1099, 1118-1119 (*Gray*) [mitigation measure aimed at restoring water supplies governed only by generalized goal, not specific performance criteria]; *San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, 670 [measures intended to protect vernal pools relied on generalized goal and lacked specific performance criteria or standards].)

In defending M-GHG-1, the County asserts that CEQA permits shifting the responsibility to perform a mitigation measure to agency staff's discretion. The County contends the discretion given the Director under M-GHG-1 is similar to mitigation upheld in *California Clean Energy Committee v. City of Woodland* (2014) 225 Cal.App.4th 173 (*California Clean*), *Mount Shasta Bioregional Ecology Center v. County of Siskiyou* (2012) 210 Cal.App.4th 184 (*Mount Shasta*), and *Gray*, *supra*, 167 Cal.App.4th 1099. However, these cases do not support the County's claims.

In *California Clean*, a city certified an EIR for a 234-acre shopping center. A mitigation measure required the developer to submit a market study and urban decay analysis for approval by the city's community development department (Department). (*California Clean*, *supra*, 225 Cal.App.4th at p. 193.) The appellate court held that the

66

mitigation measure properly delegated review and approval authority to the Department. However, the court held the measure violated CEQA by failing to specify actions required to alleviate urban decay. (*Id*. at pp. 193-195.) Similarly here, there is nothing inherently unlawful under CEQA by delegating M-GHG-1 determinations to the Director. The problem is that M-GHG-1 contains no objective criteria for exercising that discretion to ensure that the GHG emissions reduction goals are actually met.

In *Mount Shasta*, plaintiffs challenged an EIR for a project expanding an existing manufacturing facility. (*Mount Shasta*, *supra*, 210 Cal.App.4th at p. 190.) The Court of Appeal upheld noise mitigation measures that required postoperation acoustical testing if noise exceeded the level of significance (an increase of at least 3.0 dBA and an overall noise level above the applicable city or County standard). (*Id.* at p. 208.) However, unlike *Mount Shasta*, here M-GHG-1 contains no objective standard to govern the Director's discretion. Feasible means "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, legal, social, and technological factors." (Guidelines, § 15364.) M-GHG-1 contains no objective criteria for the Director to apply in making these factual determinations.

M-GHG-1's lack of objective standards is well illustrated by comparing it to the mitigation measure in *Sierra Club*, *supra*, 6 Cal.5th 502. That case involved an EIR for a planned community of 2,500 homes. (*Id.* at p. 508.) A mitigation measure provided that HVAC units would be equipped with a catalyst if "reasonably available and economically feasible." (*Id*. at p. 525.) The Supreme Court held that mitigation measure passed CEQA muster because the EIR objectively defined "economically feasible" to mean costing less

67

than 10 percent of the base HVAC cost. (*Ibid*.) In contrast here, M-GHG-1 contains no objective standard of feasibility.

The County's reliance on *Gray*, *supra*, 167 Cal.App.4th 1099 is also untenable. There, to mitigate night light impacts, the EIR required that exterior lighting shall be designed and maintained "such that glare and reflections are contained within the boundaries of the parcel, and shall be hooded and directed downward and away from adjoining properties and public rights-of-way." (*Id*. at p. 1126.) The measure also prohibited blinking and flashing lights and provided that all light fixtures "shall be appropriate to the use they are serving in scale, intensity, and height." (*Ibid*.) The measure stated, "[A]ll exterior lighting will be designed, installed and operated as required by the Planning Director." (*Ibid*.) The Court of Appeal upheld the measure because the agency had committed itself to "specific performance standards"—that lighting be hooded and directed away from adjacent properties and towards the project site. (*Id*. at p. 1127.) M-GHG-1 is materially different because mitigation measures are based on the Director's private and subjective discretionary determinations.

In a related argument, citing *Sacramentans for Fair Planning v. City of Sacramento* (2019) 37 Cal.App.5th 698 (*Sacramentans*), the County also asserts that the Director's discretion under M-GHG-1 is "no greater" than the discretion afforded to the staff member in that case to determine that a housing project provided "a significant community benefit." However, the discretionary issue in *Sacramentans* was whether the

68

city's approval resulted from an unconstitutional delegation of legislative authority. (*Id.* at p. 716.) The case does not involve deferred mitigation.[33]

The County also defends M-GHG-1's lack of objective standards by emphasizing that scientific knowledge in this area is constantly evolving. We agree that an agency should be encouraged to adopt flexible mitigation measures that can adapt as better technology becomes available (unless those changes increase the project's significant impacts). (See *Sierra Club*, *supra*, 6 Cal.5th at p. 524.) However, "the novelty of greenhouse gas mitigation measures is one of the most important reasons 'that mitigation measures timely be set forth, that environmental information be complete and relevant, and that environmental decisions be made in an accountable arena." (*CBE*, *supra*, 184 Cal.App.4th at p. 96.) Although "foreseeing the unforeseeable is not possible, an agency must use its best efforts to find out and disclose all that it reasonably can." (*Ibid*.)

The County's reliance on *California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603 (*Native Plant*) is also unpersuasive. There, a project significantly impacted vernal pool habitat. (*Id.* at p. 610.) Mitigation measures included acquiring offsite habitat. (*Id.* at p. 612.) Project opponents asserted that the agency improperly deferred mitigation by failing to specify where offsite vernal pools might be acquired. (*Ibid*.) The Court of Appeal rejected that contention because the

---

33     The CEQA issues in *Sacramentans* were whether (1) the regional transportation and emissions reduction plan were inadequate; and (2) the impact analysis improperly tiered to prior environmental impact reports. (*Sacramentans*, *supra*, 37 Cal.App.5th at p. 718.)

mitigation measure included objective criteria—replacement habitat in a specified ratio (2:1) to the habitat lost from the project. (*Id.* at pp. 621-622.) The case is inapposite because M-GHG-1 lacks objective criteria to ensure mitigation is effective.

Citing *Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, the County also contends that "courts have upheld mitigation measures such as M-GHG-1 where a building official . . . must review and approve a plan or proposed implementation of a mitigation measure, essentially performing a mitigation monitoring function." However, this argument misses the target. The CEQA defect in M-GHG-1 is not that it allows one person—the Director—to make discretionary decisions. The problem is M-GHG-1 lacks objective criteria to ensure the Director's exercise of that discretion will result in GHG reduction that is real, permanent, quantifiable, verifiable, enforceable, and additional. Unlike M-GHG-1, the mitigation measure in *Gentry* was "subject to a host of specific performance criteria imposed by various ordinances, codes, and standards, as well as other mitigation conditions." (*Id.* at p. 1395.)

F. *The Effect of M-GHG-1's Invalidity on the CAP*

After determining that M-GHG-1 was invalid under CEQA, the superior court also held the CAP was invalid because it "expressly incorporated" M-GHG-1 by reference. As explained *ante*, we read the CAP differently because M-GHG-1 is not a CAP GHG emission reduction measure for GPU-consistent projects, but rather is a mitigation measure for GPAs in the SEIR. Nevertheless, we too conclude that the CAP is tainted by M-GHG-1, albeit on somewhat different grounds.

70

The CAP contains in-County GHG projections for 2020, 2030, and 2050. Those projections perform important CEQA functions by (1) informing the public of the total GHG emissions to be expected if the CAP is implemented; and (2) determining the extent to which a GPU-consistent project must eliminate or reduce GHG emissions to be within the threshold of significance.

These projections exclude forecasted GHG emissions from future GPAs and in-process GPAs that the County had not adopted by August 2017. The CAP excludes these on the assumption that in-process and future GPAs will mitigate GHG emissions above the CAP to zero under M-GHG-1. Because M-GHG-1 is invalid, there is no factual basis for that assumption. Accordingly, to this extent the CAP's finding that in-process and future GPAs would not result in significant GHG impacts is not supported by substantial evidence.

G. *The SEIR Discloses M-GHG-1's 30-Year Shelf Life*

Golden Door contends that the CAP and SEIR are misleading because they do not disclose that M-GHG-1 requires offsets for only 30 years, after which "any purported GHG reductions from offset credits vanish, and the County's ability to meet GHG targets worsens significantly." However, the SEIR states, "M-GHG-1 . . . requires GPAs that increase density or intensity above the 2011 GPU to offset additional (Option 1) or all (Option 2) GHG emissions for a 30-year period." The SEIR also explains that a 30-year

71

project life is "consistent with the 30-year project lifetime frame used by the South Coast Air Quality Management District's GHG guidance (SCAQMD 2008)."

III.

*CUMULATIVE IMPACTS*

A. *Additional Background*

The SEIR identifies 21 GPAs. These include Newland Sierra (2,135 dwelling units), Otay 250 (up to 3,158 dwelling units), and Otay Ranch Village 14 (1,119 dwelling units).[34]

The SEIR acknowledges that these in-process GPAs "are reasonably foreseeable [and] have sufficient detail and plans to understand the changes in land use conditions that are proposed . . . ." The SEIR also acknowledges that these GPAs are "probable future projects that when combined with the [P]roject, could result in a cumulatively considerable effect." The SEIR addresses cumulative GHG impacts from these GPAs by requiring them to mitigate under M-GHG-1. The issue here is whether CEQA requires analysis of cumulative impacts from in-process GPAs other than, and in addition to, their projected GHG emissions.

Although conceding that "[t]he SEIR properly finds that GPAs are reasonably foreseeable," the County claims no additional cumulative impacts analysis is required because (1) "the parameters of those projects remained highly speculative"; and (2) the

---

34    Sierra Club's request for judicial notice of the County's plans for review and approval of the Otay Ranch Village 14 GPA, and that project's draft EIR is denied as irrelevant. (*SDOG*, *supra*, 13 Cal.App.5th at p. 90, fn. 8.)

County did not know whether the in-process GPAs would rely on carbon offsets, "and if so, whether that reliance would . . . result in other impacts such as air quality, noise, energy, or transportation . . . ." For the first time in its reply brief, the County further contends that even if in-process GPAs would "vastly increase GHG emissions, energy impacts, and air emissions through unaccounted VMT increases," there is no harm because "[t]he CAP would reduce GHG emissions and related air quality and energy impacts compared to conditions without the CAP."[35]

B. *Cumulative Impacts and the Standard of Review*

A cumulative impact is one "created as a result of the combination of the project evaluated in the EIR together with other projects causing related impacts". (Guidelines, § 15130, subd. (a)(1).) "The cumulative impact from several projects is the change in the environment which results from the incremental impact of the project when added to other closely related past, present, and reasonably foreseeable probable future projects." (*Id.*, § 15355, subd. (b).)

Environmental impacts of probable future projects must be analyzed because "consideration of the effects of a project or projects as if no others existed would encourage the piecemeal approval of several projects that, taken together, could

---

[35]    Also for the first time in its reply brief, the County claims that the SEIR analyzed air quality emissions from "reasonably foreseeable" GPAs "based on their location and proposed mix of uses . . . ." However, by not raising these arguments in its opening brief, the County has forfeited them. (*Doe*, *supra*, 173 Cal.App.4th at p. 1115.) Applying forfeiture is especially appropriate because in the opening brief, the County took a contrary position, asserting that no cumulative impact analysis beyond GHG emissions was required.

overwhelm the natural environment and disastrously overburden the man-made infrastructure and vital community services. This would effectively defeat CEQA's mandate to review the actual effect of the projects upon the environment." (*Las Virgenes Homeowners Fed'n v. County of L. A.* (1986) 177 Cal.App.3d 300, 306.) The agency must interpret this requirement to " 'afford the fullest possible protection of the environment.' " (*Friends of the Eel River v. Sonoma County Water Agency* (2003) 108 Cal.App.4th 859, 868 (*Eel River*).)

An EIR must analyze cumulative impacts of a project when the project's incremental effect is cumulatively considerable. (Guidelines, § 15130, subd. (a); *Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1214 (*Bakersfield Citizens*).) Moreover, if a mitigation measure would itself create new significant environmental impacts, these too must be discussed, "though in less detail than required for those caused by the project itself." (*Forest Foundation*, *supra*, 17 Cal.App.5th at p. 432.)

Even where, as here, a program EIR is involved, "[t]he fact more precise information may be available during the next tier of environmental review does not excuse [the agency] from providing what information it reasonably can now. [Citation.] Moreover, if known impacts are not analyzed and addressed in a program EIR, they may potentially escape analysis in a later-tier EIR." (*Forest Foundation*, *supra*, 17 Cal.App.5th at p. 440.) "If, on the other hand, the cumulative impact is insignificant or if the project's incremental contribution to the impact is not cumulatively considerable, the lead agency is not required to conduct a full cumulative impacts analysis, but the EIR

74

must include a brief explanation of the basis for the agency's finding(s)." (*San Francisco Baykeeper, Inc. v. State Lands Com.* (2015) 242 Cal.App.4th 202, 222 (*SF Baykeeper*).)

" 'We review an agency's decision regarding the inclusion of information in the cumulative impacts analysis under an abuse of discretion standard. "The primary determination is whether it was reasonable and practical to include the projects and whether, without their inclusion, the severity and significance of the cumulative impacts were reflected adequately." ' " (*Rodeo Citizens Assn. v. County of Contra Costa* (2018) 22 Cal.App.5th 214, 231 (*Rodeo Citizens*).)

### C. *The SEIR's Cumulative Impacts Analysis Fails Because It Does Not Address Impacts by GPAs Mitigating GHG Emissions under M-GHG-1*

When conducting a cumulative impacts analysis, an agency must include closely related projects that are currently under environmental review. This is because once review is begun, a significant investment of time, money, and planning has probably occurred. Thus, once an EIR is initiated, the project is probable rather than merely possible. (*Eel River*, *supra*, 108 Cal.App.4th at p. 870.)

For example, in *San Franciscans for Reasonable Growth v. City & County of San Francisco* (1984) 151 Cal.App.3d 61 (*SFRG*), the agency considered a proposal to construct high-rise downtown office buildings. (*Id.* at p. 67.) As part of its cumulative impacts analysis, the agency considered the amount of new office space that would be added to the area by other approved projects. (*Id.* at p. 68.) Project opponents asserted that the agency violated CEQA by failing to consider projects then under environmental review. (*Id.* p. 74.) The Court of Appeal agreed, stating, "Because projects under

75

environmental review . . . could easily have been ascertained by the [agency] from its own records, there was no practical or reasonable barrier to their disclosure and inclusion in the analyses. . . . The only reason we can infer for the [agency's] failure to consider and analyze this group of projects was that it was more expedient to ignore them." (*Ibid.*) Elaborating, the appellate court stated:

> "First, experience and common sense indicate that projects which are under review are ['reasonably] foreseeable probable future projects. . . .' Ordinarily an office building project that is awaiting environmental approval has reached a stage of development where the developer, financial institutions, and contractors almost certainly view its construction to be a very real probability, and not without reason. Such a view is doubtless shared by those performing the environmental review and preparing the EIR.

> "Second, we find it illogical that an EIR should carefully evaluate the direct impacts of one project which is 'under environmental review,' but completely ignore the cumulative impacts of that project's siblings in the same category. Nothing makes the EIR's subject project more 'probable' or 'foreseeable' than any of the other projects under review, just as nothing makes them less so." (*SFRG*, *supra*, 151 Cal.App.3d at p. 75.)

Here, the 21 in-process GPAs, if constructed, would collectively add nearly 14,000 dwelling units in the unincorporated County. The EIRs for just five of these disclose they will collectively produce 139,485 MTCO$_2$e in construction-related GHG emissions alone.[36] However, the SEIR does not analyze these cumulative impacts— except by stating that in-process GPAs will mitigate to zero above the CAP under M-GHG-1.

---

36     One hundred thirty nine thousand four hundred eighty five MTCO$_2$e is equivalent to about one year of GHG emissions from 30,000 combustion engine cars.

These in-process GPAs are closely related projects currently under environmental review. They are closely related because the CAP and SEIR address GHG emissions reduction in the unincorporated County and from County operations, and the GPAs will create GHG emissions in this same geographic area. These GPAs are in the process of environmental review by the County as lead agency. Accordingly, the SEIR should have considered whether these GPAs (listed in Table 1-3 of the SEIR) would create cumulatively considerable impacts in addition to GHG impacts in combination with the Project.[37] As Golden Door correctly notes, cumulative impacts from adding 14,000 dwellings and related infrastructure in projects utilizing M-GHG-1 (and, therefore, using offsite carbon offsets to mitigate their in-County GHG emissions) would likely include impacts to air quality, energy, and vehicle miles traveled, among others. "The absence of this analysis makes the [S]EIR an inadequate informational document." (*Eel River*, *supra*, 108 Cal.App.4th at p. 872.)

The County contends that analyzing cumulative impacts (in addition to GHG impacts) from in-process GPAs requires an inappropriate level of detail for the SEIR. However, the detail required for a cumulative impact analysis is based on reasonableness and practicality. (*Rodeo Citizens*, *supra*, 22 Cal.App.5th at p. 231.) In this case, the SEIR admits that the in-process GPAs are "reasonably foreseeable [and] have sufficient detail and plans to understand the changes in land use conditions that are proposed."

---

[37]    SEIR Table 1-3 contains "the complete list of GPAs" that were under County review as of August 2017.

Despite knowing that (1) these probable GPAs would add some 14,000 homes, and (2) these projects would implement M-GHG-1 by using offsite carbon offsets—the County did not analyze *any* of their cumulative impacts apart from GHG emissions (which the SEIR concluded would be mitigated to zero above the CAP.) The problem here is not a lack of detail about a cumulative impact considered; the CEQA defect is the failure to analyze any such cumulative impact at all.

The County does not explain how the GPAs could be probable and foreseeable enough to create cumulatively considerable GHG impacts, but not probable and foreseeable enough to create, for example, vehicle miles traveled impacts from projects expected to add 14,000 new homes to the backcountry. Of course, if a potential cumulative impact is insignificant, the lead agency is not required to conduct "a full cumulative impacts analysis," but must explain the basis for the finding of insignificance. (*SF Baykeeper*, *supra*, 242 Cal.App.4th at p. 222.) However, the SEIR also fails to engage in that analysis.

The County also defends its failure to analyze these cumulative impacts by asserting, "CEQA does not require the SEIR to speculate about whether the County would approve pending project applications or the conditions imposed should the County approve them." Citing *Sacramento Old City Assn. v. City Council* (1991) 229 Cal.App.3d 1011 (*Sacramento Old City*) and *Environmental Council of Sacramento v. City of Sacramento* (2006) 142 Cal.App.4th 1018 (*Environmental Council of Sacramento*), the County asserts that "[e]ven though applications for GPAs existed . . . the parameters of those projects remained highly speculative." The County

claims it did not know of changes that might be made "during the public process, whether the future and proposed projects would rely on carbon offsets, and if so, whether that reliance would . . . result in other impacts such as air quality, noise, energy, or transportation." The County repeated this at oral argument, noting that after the County certified the SEIR, the general plan amendment for one of the in-process GPAs was set aside by referendum.

However, the SEIR itself contradicts the claim that the GPAs were too speculative. Table 1-3 of the SEIR contains a list of "past, present, and *probable* future projects that when combined with the [P]roject could result in a cumulatively considerable effect." (Italics added.) Moreover, the County's reliance on *Sacramento Old City* and *Environmental Council of Sacramento* for the opposite conclusion is unavailing. In both cases, the future projects were not then in *any* stage of development. In *Sacramento Old City*, plaintiffs challenged an EIR for a project expanding a convention center and constructing an office tower. (*Sacramento Old City*, *supra*, 229 Cal.App.3d at p. 1016.) Among other things, the EIR determined that an additional 2,621 parking spaces would be needed. (*Id.* at p. 1020.) Plaintiffs argued that mitigation measures to accommodate the 2,600 parking space deficit would include constructing new downtown parking lots, erecting a large parking garage, or shuttling hundreds of people from outlying parking areas—all of which in themselves would create substantial cumulative environmental impacts that must be analyzed in the EIR, but were not. (*Id.* at p. 1030.) The Court of Appeal rejected that contention, stating, " 'prophecy' is not required in an EIR" and "[n]or

79

do we require discussion in the EIR of specific future action that is merely contemplated or a gleam in the planner's eye." (*Id.* at p. 1031.)

*Environmental Council* involved a habitat conservation plan and implementation agreement for protecting hawks and snakes in a 53,537 acre basin. (*Environmental Council of Sacramento*, *supra*, 142 Cal.App.4th at p. 1023.) The conservation plan established a program to minimize and mitigate the expected loss of habitat and incidental killing of covered species that could result from authorized urban development of 17,500 acres. (*Id.* at p. 1025.) Subsequently, the city and county adopted a memorandum of understanding (MOU) outlining an approach for future agreements regarding land use in the basin. (*Id.* at pp. 1029-1030.) The MOU did not approve development nor involve any specific development proposals. (*Id.* at p. 1030.) No funds were committed under the MOU, and the MOU did not change any existing land use requirements but rather contemplated further discretionary approvals and environmental review. (*Ibid.*) A federal court described the MOU as "tentative" and stated that development under the MOU "was not reasonably certain to occur . . . ." (*Ibid.*) The plaintiffs in *Environmental Council* asserted that CEQA required the agencies to consider cumulative impacts from the MOU. (*Id.* at pp. 1028-1029.) The Court of Appeal rejected that argument because the MOU involved "unspecified and uncertain development that might be approved in the future" and "[f]ar too little is known about the scope, the location, or the types of projects that might be proposed in the future . . . ." (*Id*. at p. 1032.)

80

In sharp contrast here, the in-process GPAs were well beyond the initial planning stages. The County knew the scope, location, types of projects being proposed and, in some cases, even specific amounts of GHG emissions that would be mitigated with offset credits originating out of County. In the superior court, the County filed a declaration by one of its planning managers, who authenticated excerpts from the Lake Jennings Marketplace EIR. That EIR requires the applicant to purchase 2,708 $MTCO_2e$ in offset credits before the first grading permit is issued and another 71,880 $MTCO_2e$ of credits before the first certificate of occupancy is issued. In the same declaration, the planning manager also authenticated EIR excerpts of five other in-process GPAs with similar GHG mitigation measures. As summarized in the table *post*, these in-process GPAs will mitigate GHG emissions by purchasing listed amounts of offset credits, almost certainly originating outside the County:

| Project | EIR date | Offset Provision Summary |
|---------|----------|--------------------------|
| Newland Sierra[38] | Draft EIR circulated June 2017. | Requires carbon offsets for approximately 82 percent of its GHG emissions. Allows international offsets. |
| Warner Ranch | Draft EIR circulated December 2016. | Requires purchasing 2,413 MTCO2e in annual carbon offsets. |
| Harmony Grove Village South | Draft EIR in April 2017, revised in February 2018. | Requires 4,411 MTCO2e in offset credits before issuance of the first grading permit and thereafter 5,222 annually; allows international offsets. |

[38] The administrative record contains public communications stating that the Newland Sierra project includes a GPA that would add over 2,100 homes in an area zoned for only 99 homes in the GPU and is six miles from the nearest public transit center.

| Valiano | Final EIR published in February 2018. | Requires offset credits up to 6,123 MTCO2e to mitigate construction-related GHG emissions and 4,493 annually for operational GHG emissions. |
| Otay 250 | Final EIR published in March 2018. | Even with onsite mitigation, the project will result in 37,554 MTCO2e that may be mitigated with offsets, including internationally. |

As lead agency, the County had access to these EIRs and, therefore, was not required to speculate about their contents. The County knew or reasonably should have known that these GPAs would almost certainly be purchasing out-of-County credits to offset in-County GHG emissions. Accordingly, the SEIR was required to consider whether these GPAs and others like them would lead to significant cumulative impacts in combination with the Project.

In a related argument, the County urges that cumulative impact analysis should be deferred until project-specific environmental review of each of the GPAs. However, in *Forest Foundation*, this court rejected a similar argument, stating: " 'Designating an EIR as a program EIR . . . does not by itself decrease the level of analysis otherwise required in the EIR. [I]n considering a challenge to a program EIR, 'it is unconstructive to ask whether the EIR provided "project-level" as opposed to "program-level" detail and analysis. Instead, we focus on whether the EIR provided "decisionmakers with sufficient analysis to intelligently consider the environmental consequences of [the] project.' " (*Forest Foundation*, *supra*, 17 Cal.App.5th at p. 426.)

82

In sum, the SEIR's cumulative impact analysis is inadequate because it fails to address reasonably known cumulatively considerable impacts from probable GPAs utilizing M-GHG-1 to mitigate GHG emissions by purchasing out-of-County offsets.[39]

IV.

*THE SEIR'S FINDING OF CONSISTENCY WITH THE REGIONAL TRANSPORTATION PLAN IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE*

A. *Senate Bill No. 375—Background*

In 2008, the Legislature enacted the Sustainable Communities and Climate Protection Act (Stats. 2008, ch. 728, § 1; Stats. 2009, ch. 354, § 5), commonly known as Senate Bill No. 375 (Sen. Bill No. 375), to reduce GHG emissions through improved land use and transportation planning. Sen. Bill No. 375's findings and legislative declarations, quoted in part below, emphasize the necessity for changed land use patterns and improved transportation to meet Assem. Bill No. 32 goals:

> "(a) The transportation sector contributes over 40 percent of the greenhouse gas emissions in the State of California; automobiles and light trucks alone contribute almost 30 percent. The transportation sector is the single largest contributor of greenhouse gases of any sector. [¶] . . . [¶]

> "(c) Greenhouse gas emissions from automobiles and light trucks can be substantially reduced by new vehicle technology and by the increased use of low carbon fuel. However, even taking these measures into account, it will be necessary to achieve significant additional greenhouse gas reductions from changed land use patterns and improved transportation. *Without improved land use and transportation policy, California will not be able to achieve the*

---

39    Our analysis assumes without deciding that the GHG mitigation measure(s) in EIRs for these in-process GPAs is/are lawful. Those projects are not before us and we express no opinion on that issue.

*goals of AB 32.*"  (Gov. Code, § 14522.1 [Section 1 of Stats. 2008, ch. 728 [Sen. Bill No. 375]], italics added.)

Under Sen. Bill No. 375, CARB must develop region-by-region emission reduction targets for automobiles and light trucks for 2020 and 2035.  (Gov. Code, § 65080, subd. (b)(2)(A).)  "The targets set by CARB for the San Diego region, using a 2005 baseline, require a 7 percent per capita reduction in greenhouse gas emissions by 2020 and a 13 percent per capita reduction by 2035."  (*Cleveland National*, *supra*, 3 Cal.5th at p. 506.)

Metropolitan planning organizations (MPOs) are also involved in implementing Sen. Bill No. 375.  MPOs are federally required organizations comprised of representatives of local government, transportation agencies, and state officials. (23 U.S.C. § 134.)  The San Diego Association of Governments (SANDAG) is the MPO for the San Diego region.

Under Sen. Bill No. 375, each MPO must draft and adopt a Sustainable Communities Strategy (SCS) as part of its regional transportation plan (RTP).  (Gov. Code, § 65080, subd. (b)(2)(B).)  CARB reviews and either approves or rejects each SCS. (*Id.*, subd. (b)(2)(J)(ii).)

An SCS establishes how planned land uses and transportation projects will achieve CARB's GHG reduction targets.  These include "a forecasted development pattern for the region, which, when integrated with the transportation network, and other transportation measures and policies, will reduce the greenhouse gas emissions from automobiles and light trucks to achieve, if there is a feasible way to do so, the greenhouse gas emission

reduction targets approved by [CARB] . . . ." (Gov. Code, § 65080, subd. (b)(2)(B)(vii).)

An SCS must also (1) assess how to provide housing for all income levels of the regional population, projected eight years into the future; and (2) identify a transportation network to service the region's transportation needs. (*Id.*, subd. (b)(2)(B)(iii) & (iv).)

"The reductions mandated by [Sen. Bill No. 375] may be achieved through a variety of means, including 'smart growth' planning to maximize building densities at locations served by public transit and to locate residences near needed services and shopping to reduce automobile dependency.[40] Other means include shifting investment toward mass transit, changing transportation pricing, and encouraging car sharing, walking, and biking." (*Cleveland National*, *supra*, 3 Cal.5th at p. 506.)

Because the RTP must be internally consistent, the housing needs analysis and the reductions in GHG emissions must work together to achieve the stated goals. (Gov. Code, § 65080, subd. (b) ["The [RTP] shall be an internally consistent document"].) However, the SCS is not the equivalent of a general plan. The SCS does not directly require local government to take particular actions in planning, regulating, and permitting land development. (Gov. Code, § 65080, subd. (b)(2)(K) ["Nothing in a[n SCS] shall be interpreted as superseding the exercise of the land use authority of cities and counties within the region."].)

---

40    Smart growth means "compact, efficient, and environmentally sensitive pattern of development that focuses future growth away from rural areas and closer to existing and planned job centers and public facilities, while preserving open space and making more efficient use of existing urban infrastructure."

Sen. Bill No. 375 requires the California Transportation Commission to establish guidelines for an MPO to use in developing an RTP. (Gov. Code, § 14522.1, subd. (a)(1).) These guidelines must take VMT into account:

"(b) The guidelines shall . . . account for all of the following:

"(1) The relationship between land use density and household vehicle ownership and vehicle miles traveled in a way that is consistent with statistical research.

"(2) The impact of enhanced transit service levels on household vehicle ownership and vehicle miles traveled." (Gov. Code, § 14522.1, subd. (b)(1) & (2).)

However, under Sen. Bill No. 375, a combination of factors and methodologies may be used to achieve GHG reduction targets. Each percentage reduction in GHG emissions assigned to a particular MPO does not require that same percentage reduction in VMT. (Gov. Code, § 65080, subd. (b)(2)(A)(i).)

B. *SANDAG's Regional Plan*

As part of its mandate under Sen. Bill No. 375, SANDAG's target is to reduce the region's per capita GHG emissions from cars and light trucks by 7 percent by 2020 (when compared with a 2005 baseline), and 13 percent by 2035. To achieve these goals, SANDAG developed an SCS as part of its RTP (Regional Plan).

The Regional Plan is organized around five strategies: (1) focus housing and job growth in urbanized areas where there is existing and planned transportation infrastructure, including transit; (2) preserve sensitive habitat, open space, cultural resources, and farmland; (3) establish a transportation network that reduces GHG

86

emissions; (4) address housing needs of all economic segments of the population; and (5) implement the regional plan through incentives and collaboration.

1. *Housing*

The Regional Plan states, "Land use decisions made at the local level can impact nearly all sources of emissions . . . .  Development guided by smart growth principles—remember:  more compact communities, less suburban sprawl—brings people closer to more destinations.  It also encourages alternative travel choices, such as public transit, carpooling, walking and biking, which cut greenhouse gas emissions and other forms of pollution."

The Regional Plan notes that "[d]uring the last 15 years, our jurisdictions have changed their land use plans significantly, resulting in development patterns that concentrate future growth in urbanized areas, reduce sprawl, and preserve more land for open space and natural habitats."  SANDAG states these were "seismic shifts" in thinking about how to grow.  The Regional Plan concludes that the "long-term plans for our local cities and the County of San Diego now call for focusing new growth in the urbanized areas of the western portion of our region where more people already live."  By designing communities that better integrate land use and transportation, the Regional Plan seeks to "create more opportunities for developing a wider variety of travel choices beyond the car . . . ."

SANDAG forecasts that the San Diego region will continue to grow more sustainably.  "More compact and efficient communities, paired with a greater variety of transportation options and less sprawl, will result in preserved open space and habitat,

and a more efficient use of water and energy."  New housing should be located "in urban communities close to jobs and transit."

"While the western areas will grow over time through more compact communities, more land in the eastern two-thirds of the region will be preserved as open space."  The Regional Plan encourages local jurisdictions in the region "to continue to embrace smart growth and sustainable development" because "new growth and development in the most urbanized areas of the region is a key strategy toward sustainability."

Sen. Bill No. 375 requires that areas be identified within the region sufficient to house the region's entire population over the course of the planning period.  The Regional Plan forecasts needing 325,000 additional homes.  The Regional Plan states that "[n]ew housing should be located in urban communities close to jobs and transit."  SANDAG projects that 82 percent of homes to be built by 2050 will be attached multifamily units mostly located where the greatest investments in public transit are being made.  Approximately 55 percent of the region will be preserved as open space and parks, habitat, or farmland.

### 2. *Transportation*

The "heart" of the Regional Plan is an SCS that "charts a course toward lower GHG emissions related to cars and light trucks, and proposes other measures to make the San Diego region more environmentally sustainable."  The SCS focuses on transportation because "about a third of GHG emissions generated in this nation come from that sector alone."  Transportation is also the largest source of GHG emissions in the region.  In 2012, passenger cars and light trucks comprised 37 percent of the region's GHG

88

inventory. Although the transportation sector is responsible for the greatest GHG reductions (nearly 30 percent of the total), most of those reductions will come from higher fuel efficiency vehicles (18 percent) and a more diverse fuel mix (low carbon fuel standards) (9 percent). Statewide regional transportation plans are responsible for less than three percent of the GHG reductions.

SANDAG states that its Regional Plan will exceed its CARB targets "[b]y . . . using land in ways that make developments more compact, conserving open space, and investing in a transportation system that provides people with alternatives to driving alone." "Reducing the number of miles that people travel in their cars is an important goal." "Fuel efficiency improvements and alternatives also comprise a major part of" planned GHG emission reductions from the transportation sector.

The Regional Plan states that it will exceed CARB's goals, resulting in a 15 percent per capita reduction in emissions by 2020, and a 21 percent per capita reduction by 2035—"far more than what the state mandates require . . . ." Approximately half of the reductions would result from "investment in transit projects and their operations, managed lanes, active transportation projects" and measures "that support . . . working from home or telecommuting." "About one-quarter of the reductions are estimated from changing land use and population characteristics, while another quarter are projected from increases in the cost of driving . . . ."

C. *The SEIR's Discussion of Consistency with Sen. Bill No. 375*

1. *The CAP*

The SEIR states that the Project is consistent with the Regional Plan and with Sen. Bill No. 375. With respect to the CAP, the SEIR states that GHG reduction measure T.2.1 would "implement traffic calming measures," and measure T.2.2 would require private employers to adopt a transportation demand management program.[41] Measure T-2.3 reduces County employee VMT by 20 percent by 2030. Parking restrictions in measure T-2.4 reduce VMT by 10 percent by 2030. The SEIR concludes that "[a]dditional supporting efforts for the built environment and transportation category" in the CAP "would also encourage efforts to support the goals and policies of Sen. Bill No. 375 and the [Regional Transportation Plan]/SCS." The CAP's numerous GHG reduction measures will contribute 13 percent of GHG reductions needed to meet the 2030 target and 8 percent of the GHG reductions estimated for 2050. These include

_____

[41]  Measure T-2.1 seeks to reduce VMT by making pedestrian and bicycle trips "a more comfortable and safer experience when traveling along public roads. Specific improvements may include marked crosswalks, countdown signal timers, speed humps, and protected bikeways. Measure T-2.2 states it will reduce emissions from commute VMT in new nonresidential development by 15 percent by 2030 by amending the County Code to include a Transportation Demand Management Ordinance requiring measures such as telecommuting, car sharing, vanpools, carpools, shuttle service, bicycle parking facilities, and transit subsidies.

(1) reducing VMT by acquiring open space, agricultural easements, and updating

community plans; (2) using alternative fuels in County projects and installing electric

vehicle charging stations; and (3) establishing a local direct investment program.

Summarizing its strategy to reduce VMT, the CAP states:

> "The county's largest unincorporated communities are located in
> the western areas of the county, with access to water, sewer, roads,
> schools, and other public facilities. Focusing new development in
> and around existing unincorporated communities allows the County
> to maximize existing infrastructure . . . .

> "This strategy focuses on preserving open space and agricultural
> lands, and focusing density in the county villages. Conservation
> efforts will avoid GHG emissions from transportation and energy
> use associated with conveyance of water and solid waste service.
> Reductions in Vehicle Miles Traveled (VMT) resulting from this
> strategy will also improve air quality through reduced vehicle
> emissions and contribute to public health improvements by creating
> opportunity for active transportation choices."[42]

The SEIR also concludes that the CAP is consistent with the Regional Plan's VMT

projections. The SEIR explains this is because the County provided SANDAG land use

forecasts based on the GPU. SANDAG, in turn, used these forecasts to make VMT

projections that achieve Sen. Bill No. 375 targets. The CAP uses these same VMT

forecasts for the GHG reduction measures. The SEIR concludes that the CAP's GHG

inventory is consistent with SANDAG's VMT projections, since both are based on

projected build-out under land uses allowed under the GPU.

---

[42]    "Active transportation choices" includes any method of travel that is human
powered, such as walking and bicycling.

91

The SEIR acknowledges the "disproportionality" between the percentage of GHG emissions attributable to the transportation sector (45 percent) and the lower percentage of GHG emissions reductions attributable to CAP GHG reduction measures (13 percent). The SEIR explains that disparity is the unavoidable result of the unincorporated county's "low-density development" and "intervening distance between land uses."

### 2. *M-GHG-1*

The SEIR acknowledges that "several comments question how . . . M-GHG-1 . . . addresses the consistency of future projects proposing a [GPA] with Sen. Bill No. 375." The SEIR states that such projects "have the potential to result in a significant cumulative GHG impact because they may adversely affect the ability of the CAP to meet its targets and goal . . . ." Nevertheless, the SEIR explains that M-GHG-1 is consistent with Sen. Bill No. 375 and the Regional Plan because (1) it is the GPA applicant's responsibility (not the County's) to determine how the GPA affects VMT projections and the region's ability to meet Sen. Bill No. 375 targets; and (2) it would be "speculative" to "presuppose approval of future and proposed GPA projects, including the GHG emissions and VMT from these future projects. The SEIR concludes, therefore, that "M-GHG-1 would ensure that GPAs are mitigating their emissions such that they would not conflict with the Regional Plan and Sen. Bill No. 375 targets . . . ."

### D. *The Plaintiffs' and the Amicus Attorney General's Contentions*

Plaintiffs contend that "[t]he CAP, via M-GHG-1, creates a 'pathway' for future GPAs to mitigate their emissions through the purchase of out-of-county carbon offsets, in direct contradiction of Sen. Bill No. 375's instruction to reduce emissions from land use

92

development and transportation patterns."  In a related argument, Plaintiffs assert that "the SEIR does not fully address how facilitating sprawl development and increased VMTs by authorizing out-of-County offsets would be consistent with the [Regional Plan]."

Appearing as amicus curiae, the Attorney General amplifies these arguments, noting that one of the GPAs, Harmony Grove Village South, will increase VMT by 11.5 million miles annually.[43]  Like Plaintiffs, the Attorney General asserts that the SEIR fails as an informative document because "the SEIR does not even acknowledge that [M-GHG-1] will foreseeably result in increased VMT, let alone provide a complete analysis of its consistency with the SANDAG Plan."

E.  *The Consistency Finding is Not Supported by Substantial Evidence*

1.  *Introduction*

The SEIR concludes that M-GHG-1 is consistent with the Regional Plan and Sen. Bill No. 375 targets, stating:  "[I]ncorporation of M-GHG-1 would ensure that GPAs are mitigating their emissions such that they would not conflict with the Regional Plan and Sen. Bill No. 375 targets . . . ."  Plaintiffs challenge this finding, asserting it is not supported by substantial evidence and that as a result, the SEIR fails as an informational document.  We agree.

---

43    The Attorney General filed an amicus curiae brief under California Rules of Court, rule 8.200(c)(7).

93

An EIR must "discuss any inconsistencies between the proposed project and . . . regional plans" including "regional transportation plans." (Guidelines, § 15125, subd. (d).) This determination must be supported by substantial evidence. (See *Oakland Heritage*, *supra*, 195 Cal.App.4th at p. 898.) "In reviewing the record for substantial evidence, we presume the agency's findings are correct and resolve all conflicts and reasonable doubts in favor of the findings." (*Citizens for Positive Growth & Preservation v. City of Sacramento* (2019) 43 Cal.App.5th 609, 629.) Substantial evidence in a CEQA case is "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached. . . . Substantial evidence shall include facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts." (Guidelines, § 15384, subds. (a) & (b).)

### 2. *The SEIR's consistency finding is not supported by substantial evidence*

#### a. *Improper analysis of GPAs*

The SEIR's consistency finding is flawed because it makes unwarranted conclusions about GHG impacts from GPAs. For example, the SEIR states that projected GHG emissions from GPAs would be consistent with the Regional Plan because "the County provided SANDAG land use forecasts based on the GPU, which SANDAG then incorporated into the adopted Regional Plan" to create VMT projections that "align with the 2011 GPU." The defect in this analysis is that by definition, land uses allowed under the GPU do not include GPAs (which increase density or intensity of use beyond that

94

allowed under the GPU). Thus, if VMT projections are based on GPU land uses (as the County claims), then necessarily those projections *exclude* VMT from in-process GPAs.

The County makes a similar error in contending that CAP GHG reduction measures will reduce VMT as contemplated in the Regional Plan. The CAP's GHG emission forecasts are based on land use allowed under the GPU only and *assume* that in-process and future GPAs will mitigate GHG emissions to zero above CAP projections under M-GHG-1. Therefore, the fact that the CAP itself is consistent with VMT reductions in the SCS does not support a finding that VMT impacts by in-process and future *GPAs* will be consistent with the Regional Plan.

b. *The County's GPA arguments are misleading*

Not only does the County make unwarranted conclusions about GHG impacts from GPAs, but when the County does address VMT impacts from GPAs, its arguments are misleading. For example, the County contends that the "SEIR also includes projected GHG emissions from [GPAs] approved through the time of the draft SEIR and reasonably foreseeable [GPAs] . . . which captured in broad strokes the GHG from VMT associated with these cumulative projects." However, the CAP's GHG projections include emissions only from those GPAs that the County had *adopted* between August 2011 and August 2017. In other words, those GHG projections *exclude* emissions from the 21 in-process GPAs. The County's assertion that the SEIR includes GHG emissions from "reasonably foreseeable" GPAs is true only if "reasonably foreseeable" *excludes* in-process GPAs. Yet in its opening brief, the County concedes that in-process GPAs are "reasonably foreseeable."

95

In a related argument, the County states that GPU policies designed to reduce VMT also apply to GPAs. However, this too is misleading. Measures to reduce GHG emissions for projects with land use consistent with the GPU are found in the CAP. To the extent GPAs increase density or intensity of land use beyond that allowed under the GPU, those projects do not mitigate GHG emissions under the CAP, but rather under M-GHG-1. Indeed, in arguing that the CAP is consistent with the GPU, the County insisted on this very point—that "GPAs are not part of the project emissions of the CAP because they are part of the cumulative impact analysis in the SEIR." Therefore, the County's assertion—that GPU policies designed to reduce VMT also apply to GPAs—is true only to the limited extent that the GPA project's proposed land use is consistent with the GPU.

The County also contends substantial evidence supports the SEIR's consistency finding because "future General Plan amendments are not part of the Project . . . ." However, the CAP is part of the Project—and the CAP's GHG emission projections assume that in-process and future GPAs will implement M-GHG-1 to mitigate GHG emissions to zero above CAP GHG targets.

c. *The consistency finding is properly considered*

Last, the County makes several arguments in an attempt to remove the entire issue of consistency with the Regional Plan from the case.

First, the County contends Plaintiffs' argument improperly "conflate[s] VMTs with GHG emissions." However, "Generally, vehicle miles traveled is the most appropriate measure of transportation impacts." (Guidelines, §15064.3, subd. (a).) At oral argument,

96

the County also asserted that VMT is "just coming into play."  However, VMT has often been used in California's regulation of air quality and GHG impacts:

> "California legislation related to air pollution began to refer to vehicle miles traveled measurements of traffic flows in the context of travel demand management in the 1990s.  In 1988, enactment of [Assem. Bill No. 4420] (Sher) directed the California Energy Commission to study the potential impacts of global climate change on the state, including its transportation system.[]  The Energy Commission's 1991 report, *Global Climate Change:  Potential Impacts and Policy Recommendation*, suggested a broad range of policies and strategies for reducing greenhouse gases.[]  The eighth of the Energy Commission's recommended strategies was 'Reducing vehicle miles traveled in personal vehicles, through promoting improved and expanded transportation alternatives, vehicle miles traveled fees, and other highway use fees. . . .'  After publication of the California Energy Commission's 1991 report, reducing vehicle miles traveled was widely considered to be a potential regulatory means for greenhouse gas emission reduction."  (Dorothy J. Glancy, Vehicle Miles Traveled and Sustainable Communities, 46 McGeorge L. Rev. 23, 52-53 (2014).)

The County next contends that the SCS "does not require VMT reductions."  But this assertion distorts the record.  The Regional Plan states:  "Reducing the number of miles that people travel in their cars is an important goal for our Regional Plan" and that "[l]and use decisions made at the local level can impact nearly all sources of emissions— for better and for worse.  Development guided by smart growth principles—remember: more compact communities, less suburban sprawl—brings people closer to more destinations.  It also encourages alternative travel choices, such as public transit, carpooling, walking and biking, which cut greenhouse gas emissions and other forms of pollution."

The County further contends it is SANDAG's obligation to make the Regional Plan consistent with the GPU, and not the SEIR's obligation to explain any inconsistencies with the Regional Plan. This argument is untenable. Guidelines section 15125, subdivision (d) states that an EIR "shall discuss any inconsistencies between the proposed project and applicable . . . regional plans."

Last, citing *Environmental Council of Sacramento v. County of Sacramento* (2020) 45 Cal.App.5th 1020 (*Environmental Council of Sacramento*), the County asserts that CEQA does not require analysis of consistency with a sustainable communities strategy. In that case, the plaintiff challenged an EIR for failing to address whether it was consistent with the Sacramento Area Council of Government's (SACOG) metropolitan transportation plans/sustainable communities strategy (MTP/SCS). The Court of Appeal rejected that argument because plaintiff failed to (1) exhaust administrative remedies; and (2) "cite any evidence that a project must be evaluated under CEQA for consistency with an SCS." (*Environmental Council of Sacramento*, at p. 1037.) In contrast here, Plaintiffs exhausted administrative remedies. The SEIR acknowledges that "[m]any comments" expressed concern that proposed GHG reduction measures would not meet VMT reduction targets established by SANDAG's RTP/SCS. Moreover, unlike *Environmental Council of Sacramento*, here the SEIR does address consistency between the CAP and the RTP/SCS.

Moreover, we disagree with the dicta in *Environmental Council of Sacramento*, *supra*, 45 Cal.App.5th at page 1037 that CEQA does not require this consistency analysis. Sen. Bill No. 375 requires regional planning agencies to include a sustainable

98

communities strategy in their regional transportation plans. (Gov. Code, § 65080, subd.(b)(2)(B).) As noted, Guidelines section 15125, subdivision (d) provides that an EIR "shall discuss any inconsistencies between the proposed project and . . . regional plans. Such regional plans include . . . regional transportation plans." Accordingly, CEQA requires analysis of "any inconsistencies" between the Project and the Regional Plan.

### d. *The impact of CARB's 2017 Scoping Plan*

The Regional Plan states, "Reducing the number of miles that people travel in their cars is an important goal for our Regional Plan." One of the five Regional Plan "building blocks" is implementing "measures designed to reduce the number of miles people travel in their vehicles." The Regional Plan consistently emphasizes the necessity for "[d]evelopment guided by smart growth principles . . . more compact communities, less suburban sprawl" to reduce GHG emissions to Sen. Bill No. 375 targets. Thus, the County's failure to analyze and disclose VMT impacts caused by GPAs threatens achieving state-mandated GHG emission reduction targets.

The seriousness of this deficiency is underscored by the 2017 CARB Scoping Plan, which is the state's blueprint for meeting GHG emission reduction targets. (*Center for Biological Diversity*, *supra*, 62 Cal.4th at p. 220.) The Scoping Plan recognizes that in the past, "development patterns have led to sprawling suburban neighborhoods, a vast highway system, growth in automobile ownership, and under-prioritization of infrastructure for public transit and active transportation." The Scoping Plan states, "VMT reductions are *necessary* to achieve the 2030 target *and must be part of any*

99

*strategy evaluated in this Plan*."  (Italics added.)  The Scoping Plan emphasizes that "California must reduce demand for driving" and "lower-VMT future development patterns are *essential* to achieving public health, equity, economic, and conservation goals."

> "Local land use decisions play a particularly critical role in reducing GHG emissions associated with the transportation sector . . . .
>
> "While the State can do more to accelerate and incentivize these local decisions, local actions that reduce VMT are also necessary to meet transportation sector-specific goals and achieve the 2030 target under [Sen. Bill No. 32.]  *Through developing the Scoping Plan, CARB staff is more convinced than ever that, in addition to achieving GHG reductions from cleaner fuels and vehicles, California must also reduce VMT*."  (Italics added.)

VMT reduction is an integral part of California's strategy to reach 2030 and 2050 GHG emission reduction targets.  However, M-GHG-1 would potentially allow GPAs to mitigate 100 percent of their in-County GHG emissions by purchasing out-of-County (including international) originating offsets.  In so doing, M-GHG-1 is inconsistent with the Regional Plan because it ignores whether GPAs are located consistent with smart growth policies.

e.  *Failure to fulfill informational role*

" '[A]n EIR is required to provide the information needed to alert the public and the decision makers of the significant problems a project would create and *to discuss currently feasible mitigation measures*.'  [Citation.]  To fulfill the EIR's informational role, the discussion of the mitigation measures must contain facts and analysis, not bare conclusions and opinions.  [Citation.]  The level of detail CEQA requires in the EIR's

100

discussion of facts and analysis of the mitigation measures depends on 'whether the EIR includes enough detail "to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' " (*King & Gardiner Farms, LLC v. County of Kern* (2020) 45 Cal.App.5th 814, 869.)

The SEIR fails to comply with these informational standards. For example, at one place the SEIR claims no VMT analysis is even necessary because "M-GHG-1 would ensure that GPAs are mitigating their emissions such that they would not conflict with the Regional Plan and Sen. Bill No. 375 targets on this issue." This explanation—that it is unnecessary to consider whether GPAs using M-GHG-1 will increase VMTs because GPAs will use M-GHG-1—is meaningless.

In a response to a comment, the SEIR also states it is too "speculative" to presuppose approval of future and proposed GPA projects, including the GHG emissions and VMT from these future projects. But this argument is untenable because, as noted *ante* in the cumulative impacts discussion, many of the in-process GPAs were well into the planning process, and yet the SEIR does not analyze or discuss VMT impacts of any of them. (See *Banning Ranch*, *supra*, 2 Cal.5th at pp. 938-939.) "[T]here was no practical or reasonable barrier to [the] disclosure and inclusion" of projects currently under an agency's own environmental review." (*SFRG*, *supra*, 151 Cal.App.3d at p. 74.) Even if more precise information may be available during project-specific review, the County must still provide reasonably obtainable information, or explain (supported by substantial evidence) why it cannot do so. "[I]f known impacts are not analyzed and

101

addressed in a program EIR, they may potentially escape analysis in a later-tier EIR."

(*Forest Foundation*, *supra*, 17 Cal.App.5th at p. 440.)

V.

*THE SEIR FAILED TO ANALYZE A REASONABLE RANGE OF ALTERNATIVES*

A. *Background*

An EIR "shall describe a range of reasonable alternatives to the project . . . which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project, and evaluate the comparative merits of the alternatives. An EIR need not consider every conceivable alternative to a project. Rather, it must consider a reasonable range of potentially feasible alternatives that will foster informed decisionmaking and public participation." (Guidelines, § 15126.6, subd. (a).)

The SEIR analyzed four project alternatives:

> 1. A no-project alternative, which assumed the CAP, GPA, GHG thresholds, and Guidelines for Significance would not be implemented;

> 2. An "enhanced direct investment" alternative, in which the County would pursue the direct investment reduction measure (T-4.1) to a greater degree than currently proposed in the CAP, and without a renewable energy target;

> 3. A 100 percent renewable energy alternative that would implement the CAP with increased reliance on renewable energy to meet GHG reduction targets;

> 4. An alternative that would increase the solid waste diversion rate from 75 percent to 80 percent by 2030.

102

Although the CAP recognizes that on-road transportation is the largest source of GHG emissions in the County (45 percent of the GHG inventory), no alternative addresses VMT or transportation-related GHG emissions. Plaintiffs contend that the County violated CEQA by failing to consider smart-growth alternatives aimed at reducing VMT. As explained *post*, we agree.

B. *The SEIR's Discussion of Project Alternatives is Deficient*

The "core of an EIR is the mitigation and alternatives sections." (*Citizens of Goleta Valley*, *supra*, 52 Cal.3d at p. 564.) An agency may not approve a project that will have significant environmental impacts if there are feasible alternatives that would substantially lessen those effects. (Pub. Resources Code, § 21002; Guidelines, §§ 15002, subd. (a)(3), 15021, subd. (a)(2).)

" ' "There is no ironclad rule governing the nature or scope of the alternatives to be discussed other than the rule of reason." [Citation.] The rule of reason "requires the EIR to set forth only those alternatives necessary to permit a reasoned choice" and to "examine in detail only the ones that the lead agency determines could feasibly attain most of the basic objectives of the project." [Citation.] An EIR does not have to consider alternatives "whose effect cannot be reasonably ascertained and whose implementation is remote and speculative." ' [Citation.] A court will uphold the selection of project alternatives unless the challenger demonstrates ' "that the alternatives are manifestly unreasonable and that they do not contribute to a reasonable range of alternatives." ' " (*Forest Foundation*, *supra*, 17 Cal.App.5th at p. 436.)

Examining alternatives begins with project objectives because it is these objectives that a proposed alternative must be designed to meet. (*San Franciscans for Livable Neighborhoods v. City and County of San Francisco* (2018) 26 Cal.App.5th 596, 632.) The SEIR identifies these Project objectives:

> 1. Reduce community and County operations GHG emissions to meet 2020 and 2030 reduction targets, and provide a mechanism to meet the County's 2050 goal;
>
> 2. Identify GHG reduction strategies and measures that reduce GHG emissions from activities in the unincorporated areas;
>
> 3. Update the General Plan and GPU to incorporate and reflect the GHG reduction targets, strategies, and measures for the reduction of GHG emissions because of buildout of the General Plan;
>
> 4. Prepare a County baseline GHG emissions inventory, and analyze the potential growth of these emissions over time; and
>
> 5. Establish a comprehensive approach to reduce County GHG emissions by incorporating feasible and effective GHG emission reduction measures.

This court's decision in *Forest Foundation*, *supra*, 17 Cal.App.5th 413 is closely on point and compels the conclusion that the SEIR's alternatives section violates CEQA. *Forest Foundation* involved a program EIR for SANDAG's 2011 RTP/SCS (called the 2050 Regional Transportation Plan).[44] (*Forest Foundation*, at pp. 421, 425.) That EIR analyzed GHG emissions impacts for years 2020, 2035, and 2050. (*Id.* at p. 430.) The

---

[44] The 2050 RTP/SCS was adopted in 2011 and included a sustainable communities strategy with transportation choices designed to reduce GHGs and meet state targets set following passage of Sen. Bill No. 375. SANDAG updated the 2050 RTP four years later, naming it the 2015 Regional Plan.

EIR analyzed seven project alternatives, none of which involved reducing VMT. (*Id.* at pp. 435-436.) This court held that omitting "an alternative which could significantly reduce total vehicle miles traveled is inexplicable given SANDAG's acknowledgement in its Climate Action Strategy that the state's efforts to reduce greenhouse gas emissions from on road transportation will not succeed if the amount of driving, or vehicle miles traveled, is not significantly reduced." (*Id.* at p. 436.) The court noted that the Climate Action Strategy explained that lowering VMT can be accomplished through improved land use and transportation planning. (*Ibid.*) The Climate Action Strategy recommended increased funding and system investments for public transit, increased service on existing routes, and infrastructure upgrades. (*Id.* at pp. 436-437.) We concluded, "Given these recommendations, their purpose, and their source, it is reasonable to expect at least one project alternative to have been focused primarily on significantly reducing vehicle trips." (*Id.* at p. 437.)

Like the Climate Action Plan discussed in *Forest Foundation*, *supra*, 17 Cal.App.5th 413, here too SANDAG states the "heart" of the RTP/SCS is to lower GHG emissions "related to cars and light trucks" because "about a third of GHG emissions generation" are attributable to "that sector alone." The 2015 RTP/SCS states, "Reducing the number of miles that people travel in their cars is an important goal for our Regional Plan." The Scoping Plan states, "VMT reductions are necessary . . . and must be part of any strategy . . . ." CARB likewise states, "local actions that reduce VMT are also necessary to meet transportation sector-specific goals and achieve the 2030 target under Sen. Bill No. 32. . . . California must also reduce VMT." Indeed, CARB states, "It is

105

important that VMT reducing strategies are implemented early because more time is necessary to achieve the full climate, health, social, equity, and economic benefits from these strategies."  Thus, CARB recommends that agencies "prioritize onsite design features that reduce emissions, *especially from VMT* . . . within the project's region. . . ."

In light of this consistently clear mandate to reduce VMT to help achieve target GHG emission reductions, it is reasonable to expect at least one project alternative in the SEIR to have been focused primarily on significantly reducing VMT.[45]  (*Forest Foundation*, *supra*, 17 Cal.App.5th at p. 437.)  The SEIR's failure to do so is prejudicial because it precludes informed public participation and decisionmaking.  (*Ibid.*)

Citing *In re Bay-Delta Programmatic Environmental Impact Report Coordinated Proceedings* (2008) 43 Cal.4th 1143 (*Bay-Delta*), the County contends that implementing a smart-growth alternative would be inconsistent with project objectives, one of which is to reduce GHG emissions from buildout of the General Plan, not an *amended* General Plan.  *Bay-Delta* involved a project to restore the Bay-Delta's ecological health and improve management of Bay-Delta water for the various beneficial uses that depend on it.  (*Id.* at pp. 1151-1152.)  The Supreme Court held the failure to examine a program alternative requiring reduced water exports from the Bay-Delta was not an abuse of

---

[45]    In its response to the Attorney General's amicus brief, the County contends *Forest Foundation* is distinguishable because that case concerned SANDAG's plan to reduce GHG emissions from cars and light duty trucks.  However, that reads *Forest Foundation* too narrowly.  As here, the RTP in *Forest Foundation* also included a SCS designed to promote "a more sustainable future by integrating land use, housing, and transportation planning to create a more sustainable, walkable, transit-oriented, compact development patterns and communities . . . ."  (*Forest Foundation*, *supra*, 17 Cal.App.5th at p. 429.)

discretion because that alternative would not achieve the objective of water supply reliability. (*Id.* at pp. 1163-1166.) In other words, an agency need not discuss alternatives that cannot achieve the project's underlying purpose. (*Id.* at p. 1165.)

Here, Project objectives include (1) "[r]educe community and County operations GHG emissions . . . and provide a mechanism to meet the County's projected 2050 goal"; (2) "[i]dentify GHG reduction strategies and measures that reduce GHG emissions from activities in the unincorporated areas"; (3) "[p]repare a County baselines GHG emissions inventory, which includes community and County operations emissions, and analyze the potential growth of these emissions over time"; and (4) establish a comprehensive approach to reduce County GHG emissions by incorporating feasible and effective GHG emission reduction measures." *Bay-Delta* is materially distinguishable because here, a smart growth alternative is consistent with achieving Project objectives.

Moreover, it is impossible to take M-GHG-1 (and, therefore, GPAs) completely out of the CAP. As noted *ante*, the CAP achieves GHG reduction targets only by excluding from its projections in-process GPA GHG emissions above the CAP—on the assumption that GPAs will mitigate to zero-above-the-CAP under M-GHG-1. As a result, a project alternative based on reducing GHG emissions by implementing smart growth policies affecting GPAs is broadly consistent with CAP objectives.

Further, the GPU "includes specific goals and policies aimed at reducing GHG emissions including growing in a compact and efficient manner, using energy more efficiently, harnessing renewable energy to power buildings, improving waste recycling, and improving access to sustainable transportation." The CAP, which is based on

107

buildout under the GPU, recognizes that "[g]iven that the largest source of emissions in the unincorporated county is the On-Road Transportation sector, the CAP proposes several measures . . . to reduce the number and length of vehicle trips." Thus, there is no conflict among (1) buildout under the GPU, (2) the CAP, and (3) an alternative that would encourage smart growth and associated reduced VMT.

At oral argument, the County also asserted that the CAP is "not a land use plan, but an emissions reduction plan" and, therefore, project alternatives should also be focused on emission reduction, not land development as in a smart growth plan. This argument is untenable, however, because the County overstates the purported distinction between land use and GHG emissions. GHG emission reduction targeted by Assem. Bill No. 32 and other legislation is concerned with human activities contributing to climate change. To state the obvious, the amount of GHG emissions from agricultural land and open space will be vastly different if that same land contains 14,000 homes, roads, and infrastructure. Land use often drives GHG emission levels. Therefore, a smart growth land use alternative is reasonably related to GHG emission reduction.

Also at oral argument, the County asserted that VMT reduction "was considered," noting that the "first two" CAP GHG reduction measures involve reducing VMT. Counsel concluded, "When you're reducing VMT, you are offsetting an impact of a proposed project . . . we have a plan that is already an emissions reduction plan and it already includes VMT." However, on-road transportation accounts for 45 percent of the County's greenhouse gas inventory (as of 2014) and produced 1,456,060 $MTCO_2e$. Yet the two CAP reduction measures counsel referenced are expected to collectively reduce

108

2030 GHG emissions by 8,101 MTCO$_2$e, or less than 1 percent of the on-road transportation sector's contribution.  Therefore, contrary to the County's contention, VMT reduction in the CAP is not tantamount to a smart growth project alternative.

Finally, although this argument is not entirely clear, the County also contends its failure to include an alternative aimed at reducing VMT was compelled by this court's decision in *Sierra Club I*, *supra*, 231 Cal.App.4th 1152.  This argument is untenable. *Sierra Club I* required the County to prepare the SEIR; however, we did not address the CEQA-required content of the alternatives section in it.

## VI.

### *THE COUNTY ADEQUATELY RESPONDED TO COMMENTS ON THE DEIR*

A.  *Legal Principles*

Guidelines section 15088, subdivision (a) requires the agency to prepare a written response to "comments on environmental issues" from persons who reviewed the draft EIR.  For "significant environmental issues raised" in such comments, the agency must "describe the disposition" of such issues (for example, revisions to the proposed project) in a "good faith, reasoned analysis in response."  (Guidelines, § 15088, subd. (c).) "Conclusory statements unsupported by factual information will not suffice."  (*Ibid*.) However, "the level of detail contained in the response . . . may correspond to the level of detail provided in the comment."  (*Ibid*.)  A response may be sufficient if it refers to parts of the draft EIR that analyzes the environmental impacts raised by the comment.  (*City of Irvine v. County of Orange* (2015) 238 Cal.App.4th 526, 550 (*City of Irvine*).)  "A

general comment can be adequately met with a general response" and "[r]esponses need not be exhaustive."  (*Ibid*.)

B.  *Comments, Responses, and Analysis*

There are several hundred comments on the draft SEIR.  The superior court singled out three as having inadequate responses.  The County's opening brief challenges only these three rulings, and there is no cross-appeal challenging the adequacy of any other responses to comments.  We discuss each of these three rulings next.

*Comment O-21-4*:  Sempra Services Corporation commented that the CAP focuses too little attention on reducing GHG emissions from the transportation sector.

*Response to Comment O-21-4*:  The County responded by stating, "Please see Master Response 9 and 6."  Master Response 6 states in part, "Several comments assert that the County underutilizes opportunities to reduce emissions in the transportation sector, comparing the contribution of emissions from the transportation sector (45 [percent]) to [the] proportion of overall reductions from the Built Environment and Transportation category (13 [percent]). . . .  [¶]  The County acknowledges the disproportionality. . . .  However . . . the nature of the unincorporated county is low-density development that is not conducive to non-driving trips. . . .  In addition the County has limited jurisdiction in controlling transportation emissions apart from land use and infrastructure planning. . . .  While the nature of trips will likely continue to be personal vehicle based, the fuel source and emissions factors of those trips can be modified by switching to renewable sources including electricity. . . .  In an effort to be responsive to these comments, the County has added Measure T-3.5 to install 2,040 Level

110

electric vehicle charging stations through public-private partnerships at priority locations in the unincorporated county by 2030. Electrifying VMT allows for the use of cleaner and renewable energy to power vehicles, and reduces GHG emissions associated with gasoline-powered internal combustion engines. Investment in a larger charging network than currently exists is needed to encourage EV use and achieve additional GHG reductions beyond State goals."

*Analysis of Response to Comment O-21-4*: The response is adequate because it directly addresses the question, explains the disparity between GHG emissions reduction measures in transportation and electricity sectors, and describes revisions to the proposed project (adding measure T-3.5) to address the objection. (Guidelines, § 15088, subd. (c).) In ruling otherwise, the trial court erred by ignoring Master Response 6.

*Comment O-22-19*: The Sierra Club commented that the SEIR should include a mitigation measure "of installing a car-parking system" that gives County employees "more choice over how they spend their wages, while significantly reducing the frequency of the choice of arriving at work in a single-occupancy vehicle."

*Response to Comment O-22-19*: The County determined that unbundling the cost of parking from salaries would be infeasible because County employees work in diverse locations where parking is either free and plentiful or expensive and rare. Calculating a fair unbundled charge applicable to all County employees would be "virtually impossible under these varied conditions." The response also explained that "to institute such a policy would affect County employees' Terms and Conditions of Employment, which would require negotiation and agreement for each of the County's nine labor unions . . . .

111

The majority of the County's employees are currently covered by collective bargaining agreements, which are not open for negotiations until 2022. In addition, unbundling the cost of parking would require both elimination of subsidies paid to some classes of employees who park in paid lots, and charging employees who park for free in lots owned by the County. This would potentially affect employee income. . . . [¶] Additionally a policy to unbundle the cost of parking would need to be adopted for all County facilities to ensure equal opportunities, benefits, and access for County employees. However, this may have a disproportionate impact on employees that work at facilities in more rural areas of the County, where there is no or limited public transportation alternatives available."

*Analysis of Response to Comment O-22-19*: This response is adequate because it explains why the lead agency's position disagrees with the recommendations and objection raised in the comment. (Guidelines, § 15088, subd. (c).) The response contains factual assertions (e.g., free or subsidized parking already provided; majority of County employees under a collective bargaining agreement; unbundling parking would affect employee compensation) and analysis based on those facts. The trial court erred in determining that this response was too conclusory.

*Comment L-4-3*: SANDAG commented, "Please continue to take into consideration consistency with guiding plans for the region. . . .
SANDAG . . . encourages smart, sustainable growth and reinforces principles set forth in SANDAG's Regional Plan."

112

*Response to Comment -L4-3*:  In response, the County stated, "Section 2.10.4.2 of the Draft SEIR evaluated the CAP's consistency with guiding plans for the region."

*Analysis of Response to Comment L-4-3*:  SANDAG's comment that the County "take into consideration" consistency with regional guiding plans is simply an exhortation to comply with law.  No response was necessary.

VII.

*ISSUES INVOLVING EXHAUSTION OF ADMINISTRIVE REMEDIES*

"Exhaustion of administrative remedies is a jurisdictional prerequisite to maintenance of a CEQA action." (*Bakersfield Citizens*, *supra*, 124 Cal.App.4th at p. 1199.)  " 'That requirement is satisfied if "the alleged grounds for noncompliance with [CEQA] were presented . . . by any person during the public comment period provided by [CEQA] or prior to the close of the public hearing on the project before the issuance of the notice of determination." ' " (*City of Long Beach v. City of Los Angeles* (2018) 19 Cal.App.5th 465, 474.)  " ' "To advance the exhaustion doctrine's purpose '[t]he "exact issue" must have been presented to the administrative agency. . . ." (*Forest Foundation*, *supra*, 17 Cal.App.5th at p. 446.)  The issue raised administratively must be ' "sufficiently specific" ' so that the agency has the opportunity to evaluate and respond . . . ." (*Ibid.*)

A.  *The Challenge to the SEIR's Alternatives Analysis was Exhausted*

The County contends that Plaintiffs did not adequately exhaust remedies with respect to the SEIR's alternative projects analysis.  However, a February 2018 letter from Golden Door's attorneys to the County Board of Supervisors states in part, "The County

113

should also study a mitigation measure *or alternative* to limit General Plan Amendments to areas identified by SANDAG as 'smart growth' areas . . . . [I]t is vital to locate unplanned residential development in smart growth areas near transit and jobs. Changing land use patterns must favor smart growth over sprawl to be consistent with the RTP/SCS." (Italics added.) Raising similar issues, a January 2018 letter from Sierra Club's attorneys to the San Diego Planning Commission cites *Forest Foundation*, *supra*, 17 Cal.App.5th 431 and states, " 'The omission of an alternative which could significantly reduce total vehicle miles traveled is inexplicable given SANDAG's acknowledgements . . . that the state's efforts to reduce greenhouse gas emissions from on-road transportation will not succeed if the amount of driving, or vehicle miles traveled, is not reduced.' "

The purpose of requiring exhaustion is to afford an agency an opportunity to address contentions and possibly render litigation unnecessary. Here, that policy was fulfilled when Plaintiffs urged the County to consider an "alternative" to limit GPAs to "smart growth areas near transit and jobs" to be "consistent with the RTP/SCS." Plaintiffs' attorneys even cited one of the leading cases supporting their position. This is far from the perfunctory "skeleton showing" the County claims. Rather, Plaintiffs reasonably alerted the County to consider whether the SEIR violated CEQA by failing to analyze a smart-growth alternative aimed at reducing VMT.

B. *Environmental Justice*

Government Code section 65302 identifies required "elements" in a general plan. These include, among others, housing, conservation, open space, and noise. Effective in

114

2017, the Legislature amended this statute to require "[a]n environmental justice element . . . that identifies disadvantaged communities within the area covered by the general plan . . . ." (Gov. Code, § 65302, subd. (h)(1) [Stats. 2016, ch. 587 (Sen. Bill No. 1000), § 1.5].) The environmental justice element shall, among other things, "[i]dentify objectives and policies to reduce the unique or compounded health risks in disadvantaged communities by means that include, but are not limited to, the reduction of pollution exposure, including the improvement of air quality . . . ." (Gov. Code, § 65302, subd. (h)(1)(A).)

Addressing similar concerns, the California Environmental Protection Agency is required to "[c]onduct its programs, policies, and activities that substantially affect human health or the environment in a manner that ensures the fair treatment of people of all races, cultures, and income levels, including minority populations and low-income populations of the state." (Pub. Resources Code, § 71110, subd. (a).) And under Assem. Bill No. 32, CARB "shall ensure that the greenhouse gas emission reduction rules, regulations, programs, mechanisms, and incentives under its jurisdiction, where applicable and to the extent feasible, direct public and private investment toward the most disadvantaged communities in California . . . ." (Health & Safe. Code, § 38565.)

### 1. *The SEIR*

In the superior court, Plaintiffs asserted that the SEIR does not adequately evaluate "impacts on environmental justice." The superior court agreed, ruling that the SEIR "failed to address environmental justice" by making "no attempt to disclose the increased health damage that could occur to the more vulnerable County residents (children, the ill,

and disadvantaged communities) from the project 'increasing nonattainment criteria pollutants' . . . , or from not requiring GHG offsets to be obtained in-County."

In its opening brief, the County challenges this ruling—but only in a footnote under a heading entitled, "Petitioners Did Not Exhaust on Two Claims, Which Are Waived." That footnote states: "CEQA does not require environmental justice analysis." In support, the County cites Public Resources Code section 21083.1 (courts "shall not interpret this division or the state guidelines . . . in a manner which imposes procedural or substantive requirements beyond those explicitly stated in this division or in the state guidelines") and *Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1107, which states, "[T]he purpose of this statute was to 'limit judicial expansion of CEQA requirements.' " The footnote also asserts that "any unique adverse health burden from application of M-GHG-1 on disadvantaged communities would be too speculative to analyze as discussed in Section C.1, *supra*."

On review of a CEQA action, our role is generally the same as the trial court. (*State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 836 (*Water Resources*).) However, that means "only that we would not be bound by, or be required to show any deference to, the trial court's conclusion" on the environmental justice issue. (*Ibid*.) It does not mean that the County, as the appellant aggrieved by the trial court's determination, is entitled to seek reversal by relegating an issue to argument in a footnote. "Even when our review on appeal 'is de novo, it is limited to issues which have been adequately raised and supported in [the appellant's opening] brief. [Citations.] Issues not raised in an appellant's brief are deemed waived or abandoned.' " (*Ibid*.) To succeed

116

here, the County must first establish error. And even in a CEQA case, " '[t]he most fundamental rule of appellate review is that an appealed judgment or order is presumed to be correct.' [Citation.] It is the appellant who bears the burden of overcoming that presumption.' " (*Ibid.*, italics omitted.)

The County has forfeited this argument. (*Hall v. Department of Motor Vehicles* (2018) 26 Cal.App.5th 182, 193 [argument in footnote forfeited]; *Sabi v. Sterling* (2010) 183 Cal.App.4th 916, 947 ["Footnotes are not the appropriate vehicle for stating contentions on appeal."]; *Holden v. City of San Diego* (2019) 43 Cal.App.5th 404, 419-420 [same, collecting cases].) Indeed, the County's challenge to the trial court's environmental justice ruling is also forfeited because it is under a heading in the brief challenging only administrative exhaustion. (*Provost v. Regents of University of California* (2011) 201 Cal.App.4th 1289, 1294 ["we do not consider all of the loose and disparate arguments that are not clearly set out in a heading and supported by reasoned legal argument"].) These well settled rules of appellate practice are not mere technicalities. They ensure that opposing parties are fairly apprised of contentions so as to afford a full and fair opportunity to respond.

Although we have discretion to overlook this forfeiture, prudential concerns militate against doing so here. Whether CEQA may in some circumstances require an environmental justice analysis is at least reasonably arguable. (See generally, Alan Ramo, Environmental Justice as an Essential Tool in Environmental Review Statutes: A New Look at Federal Policies and Civil Rights Protections and California's Recent Initiatives, 19 Hastings W.-N.W. J. Envt'l. L. & Policy 41, 42 (2013) [noting that "[t]he

117

California Attorney General's recent litigation involving . . . global warming emissions[] affecting minority communities has sparked renewed interest in the relationship between environmental review laws and the doctrine of environmental justice."].)  However, the County's brief lacks analysis from which our consideration of that issue could even begin.[46]

### 2. *Amendment to the General Plan*

In the superior court, Golden Door asserted that when the County amended GPU policy COS-20 and goal COS 20.1 in 2018, this triggered "a separate requirement" under Government Code section 65302 to adopt an environmental justice element in the general plan.  The County contends Plaintiffs are precluded from making this assertion because it was not first made "during the administrative process."

Assuming without deciding that the exhaustion doctrine applies to this non-CEQA issue, it is unnecessary to consider it because Plaintiffs have abandoned the point in the trial court.  We have searched the trial court's 17-page single-spaced minute order and are unable to find any ruling on Plaintiffs' claim that the amendments to COS 20 and COS 20.1 triggered the County's obligation to add an environmental justice element to the general plan.  In ruling on a complex case such as this one, many things may be overlooked that would readily have been corrected had attention been called to them.

---

[46]    Except to the extent that this opinion has law-of-the-case and/or claim or issue preclusion effect, we do not express any opinion on whether CEQA requires environmental justice review.

118

Where the court neither rules nor reserves its ruling for later, the party pressing the point must make some effort to have the court actually rule. "If the point is not pressed and is forgotten, [the party] may be deemed to have waived or abandoned it . . . ." (*People v. Braxton* (2004) 34 Cal.4th 798, 813.)[47]

C. *Geographic Scope*

Guidelines section 15130, subdivision (b)(3) provides that an EIR's cumulative impacts analysis "should define the geographic scope of the area affected by the cumulative effect and provide a reasonable explanation for the geographic limitation used." Here, the SEIR states that the "cumulative impact analysis *study area* for GHG emissions" is the "entire unincorporated county and County local government operations." (Italics added.) The SEIR additionally states, "the issue of global climate change is inherently a cumulative issue" and, therefore, the geographical scope of the cumulative GHG analysis is global.

The superior court ruled that the SEIR violates CEQA by using "a geographic scope that was inconsistent and alternated between a 'Countywide' geographic scope of cumulative GHGs and a 'global' geographic scope." The court also determined that "the issue of inconsistent geographic areas" was "exhausted."

---

47     Therefore, it is unnecessary to consider the County's argument that even if Government Code section 65302 required adding an environmental justice element to the General Plan, one was not required because "there were no disadvantaged communities in the unincorporated County" when the County prepared the SEIR. This disposition also renders moot the County's request for judicial notice of General Plan 2017 Guidelines published by the Office of Planning and Research.

The County contends this claim was never presented during administrative proceedings. Plaintiffs do not address this issue in their appellate briefs.[48] However, in the trial court Golden Door asserted it raised the point in letters dated (1) January 16, 2018, expressing "concern[] about the CAP's mitigation measure for cumulative GHG impacts caused by General Plan Amendment projects"; (2) February 8, 2018, raising numerous objections to M-GHG-1; (3) February 13, 2018, objecting to various aspects of M-GHG-1; and (4) September 25, 2017, asserting that the CAP must provide assurances that the offset projects will achieve projected reductions.

To advance the exhaustion doctrine's purpose "[t]he 'exact issue' must have been presented to the administrative agency . . . ." [Citation.] While ' "less specificity is required to preserve an issue for appeal in an administrative proceeding than in a judicial proceeding" ' . . . 'generalized environmental comments at public hearings,' 'relatively . . . bland and general references to environmental matters' [citation] or 'isolated and unelaborated comment[s]' [citation] will not suffice.' " (*Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 535-536.) Here, the cited letters contain general criticisms of and objections to M-GHG-1. But none states that the DSEIR violates CEQA by having an inconsistent geographical scope. Accordingly, the trial court erred in determining this issue was exhausted. Necessarily, therefore, the court should not have

---

48     We nevertheless consider the point because a respondent's failure to address an issue raised in the opening brief is not a concession. (*Griffin v. The Haunted Hotel, Inc.* (2015) 242 Cal.App.4th 490, 505.)

reached the merits. Accordingly, the ruling that the SEIR's cumulative GHG impacts discussion contains an inconsistent and flawed geographical scope must also be reversed.

## VIII.

### *ENERGY ISSUE RULING FORFEITED*

The trial court ruled that the County "failed to analyze potential energy impacts that may result from GPAs and strategies to reduce energy impacts on such project sites" and also "failed to evaluate the reasonably foreseeable impacts on energy usage in allowing increased VMTs in exchange for GHG reduction through offsets." In a footnote in its brief, Golden Door contends the County has forfeited this issue on appeal by failing to address it in the opening brief. The County asserts that Golden Door itself has forfeited the waiver argument by making it only in a footnote.

Since the trial court's judgment is presumed correct, it is the appellant's burden to establish error. (*Water Resources*, *supra*, 136 Cal.App.4th at p. 836.) The County's failure to address the energy impacts ruling in its opening brief compels the conclusion the trial court's ruling on that point must be affirmed.[49]

---

[49] Golden Door also asserts (again, in a footnote) that the County did not raise any issue in its opening brief that M-GHG-1 is or is not mandatory. We agree with the County that it is unclear what Golden Door claims to be forfeited and, therefore, do not consider the point further.

121

IX.

*INCONSISTENCY BETWEEN THE CAP AND SEIR*

The SEIR must explain project impacts in a manner "reasonably calculated to inform the public . . . ." (*Sierra Club*, *supra*, 6 Cal.5th at p. 520.) The CAP states that its 2014 inventory of GHG emissions does not include emissions from GPAs that were adopted, but not constructed, as of 2014:

> "Even though there were GPAs that were *adopted* between 2011 (adoption of 2011 General Plan Update) and 2014 (inventory baseline year), none of these GPAs were constructed by 2014 and; therefore, their GHG emissions are *not included* in the 2014 *inventory*. The 2014 inventory is based on emissions-generating activities that existed on the ground in 2014." (Italics added.)

However, a portion of the SEIR states that the CAP's GHG emissions inventory *includes* GPAs adopted between August 2011 and March 28, 2017:

> "[T]he Draft CAP's GHG *inventory* includes GPAs adopted between August 2011 (adoption of 2011 GPU) and March 28, 2017 (date at which the inventory technical reports were prepared)." (Italics added.)

These are inconsistent. The first states that the inventory excludes GPAs not constructed by 2014. The second states that the inventory includes GPAs adopted by March 2017.[50]

To avoid inconsistency, the County contends we should read "inventory" as used in the first quotation (from the CAP) to mean *projected* future GHG emissions. This

---

50    We discovered this inconsistency on our own and invited supplemental briefs on the issue, which we have considered.

argument is untenable, however, because "inventory" is consistently used in the CAP and elsewhere in the SEIR to mean existing emissions, not future projections.

## X.

### *REMEDIES*

For the first time in its reply brief, and citing Public Resources Code section 21168.9, the County contends that even if M-GHG-1 violates CEQA, we should "nonetheless allow the CAP to stand under CEQA's provisions for severable remedies.[51] The County asserts this remedy is particularly appropriate here because the CAP is not "tainted by any CEQA violation found with respect to M-GHG-1" and "M-GHG-1 is not required for the CAP . . . ."  This argument fails for two reasons.  First, the County has forfeited this argument by not asserting it in the opening brief.  "We will not ordinarily consider issues raised for the first time in a reply brief.  [Citation.]  An issue is new if it

---

[51]     Public Resources Code section 21168.9 provides in part:  "(a) If a court finds, . . . that any determination, finding, or decision of a public agency has been made without compliance with this division, the court shall enter an order that includes one or more of the following:  [¶]  (1) A mandate that the determination, finding, or decision be voided by the public agency, in whole or in part.  [¶] . . . [¶]  (3) A mandate that the public agency take specific action as may be necessary to bring the determination, finding, or decision into compliance with this division.  [¶]  (b) Any order pursuant to subdivision (a) shall include only those mandates which are necessary to achieve compliance with this division and only those specific project activities in noncompliance with this division.  The order shall be made by the issuance of a peremptory writ of mandate specifying what action by the public agency is necessary to comply with this division.  However, the order shall be limited to that portion of a determination, finding, or decision or the specific project activity or activities found to be in noncompliance only if a court finds that (1) the portion or specific project activity or activities are severable, (2) severance will not prejudice complete and full compliance with this division, and (3) the court has not found the remainder of the project to be in noncompliance with this division."

does more than elaborate on issues raised in the opening brief or rebut arguments made by the respondent in respondent's brief. Fairness militates against allowing an appellant to raise an issue for the first time in a reply brief because consideration of the issue deprives the respondent of the opportunity to counter the appellant by raising opposing arguments about the new issue." (*American Indian Model Schools v. Oakland Unified School Dist.* (2014) 227 Cal.App.4th 258, 275-276.)

Moreover, even if not forfeited, we would reject the argument. " 'Directing an agency to void its approval of the project is a typical remedy . . . for a CEQA violation.' " (*John R. Lawson Rock & Oil, Inc. v. State Air Resources Bd.* (2018) 20 Cal.App.5th 77, 102.) As explained *ante*, to the extent the CAP's GHG emission projections for GPAs assume mitigation to zero or net zero under M-GHG-1, the CAP's projection is unsupported by substantial evidence. Severing the CAP from M-GHG-1 would not result in "complete and full compliance" with CEQA and is, therefore, not authorized by Public Resources Code section 21168.9, subdivision (b).

Citing *POET, LLC v. State Air Resources Bd.* (2013) 218 Cal.App.4th 681 (*POET*), the County contends the court should allow the CAP to remain in effect even if M-GHG-1 is invalid. At oral argument, the County asserted that "all of the work that went into the CAP is something that should be preserved."

We disagree. The CAP's strategies and measures are designed to reduce GHG emissions for build-out under the GPU. The CAP does so by (1) calculating a baseline GHG emissions level as of 2014; and (2) estimating future GHG emissions under a

124

business as usual standard; and (3) implementing state mandated GHG reduction targets. If any *one* of these calculations is erroneous, the CAP fails to accomplish its purpose.

In addition to the inconsistency between the CAP and SEIR discussed *ante* in part IX, the problem here is with the CAP's GHG projections. The projections assume that in-process and future GPAs will mitigate to zero-above-the-CAP under M-GHG-1. Because M-GHG-1 is invalid, these projections are not accurate. There is no assurance that in-process and future GPAs will in fact mitigate to net zero. Thus, there is no evidence that the CAP's reduction measures will achieve the stated reduction targets, even for projects consistent with the GPU. In sum, it is impossible to surgically excise M-GHG-1 from the CAP to produce a valid stand-alone climate action plan.

The County's reliance on *POET* is not persuasive. There, the CEQA project was a statewide regulation concerning low carbon fuel standards. CARB's low carbon fuel standards regulations satisfied "a vast majority of the applicable legal requirements, but ran afoul of several procedural requirements . . . ." (*POET*, *supra*, 217 Cal.App.4th at p. 697.) The appellate court determined that in the "extraordinary case" before it, suspending the fuel standards regulations would do more environmental harm than allowing them to remain in effect pending the completion of CARB's corrective action. (*Id.* at pp. 697, 761.) Accordingly, the appellate court exercised its inherent equitable authority to maintain the status quo and allow the regulations to remain operative. (*Id.* at p. 761.)

Unlike *POET*, the CEQA defect in the CAP is not procedural. The CAP is substantively flawed because its projections depend upon the validity of M-GHG-1 to

125

reduce GHG emissions for probable in-process and all future GPAs to zero-above-the-cap, and M-GHG-1 itself is invalid under CEQA.

## XI.

### *NO SPECIAL MASTER*

Citing *Legislature of California v. Reinecke* (1973) 9 Cal.3d 166 and *Wilson v. Eu* (1991) 54 Cal.3d 471, Golden Door asks us to appoint a special master to "work with all interested parties to assure the County expeditiously prepares an adequate CAP and accompanying SEIR . . . ."  However, both cited cases involve legislative impasse in enacting reapportionment plans.  The Court intervened in those cases and appointed special masters because the legislative impasse might continue indefinitely, the Court's duty to ensure equal protection of the laws was implicated, and electoral rights would be irretrievably lost if no action were taken.  (*Wilson*, at p. 473.)  Especially given the existing injunction prohibiting the County from relying on M-GHG-1 during CEQA review of GHG emissions impacts of development proposals on unincorporated County lands, similar exigent circumstances are lacking here.

## XII.

### *THE COURT DECLINES TO PROVIDE AN ADVISORY OPINION*

Citing no authority, Sierra Club asks that we provide "a clear declaration that no out-of-County offsets are permitted under the current General Plan.  Sierra Club also asks that we "further declare that before the County could reauthorize out-of-County offsets, the County would have to adequately analyze the direct and cumulative impacts of such a program under CEQA, determine that in-County reductions are not available *and cannot*

126

*be made available through a County or APCD program, and conduct the appropriate process to amend its General Plan.*"

Essentially, Sierra Club's request is for advisory opinions on mitigation measures and environmental analysis not before us in this case. It remains to be seen how the County will amend the CAP, the SEIR, and M-GHG-1 to comply with this opinion. Accordingly, we decline to issue advisory opinions to forestall hypothetical events that may never occur. (*Teachers' Retirement Bd. v. Genest* (2007) 154 Cal.App.4th 1012, 1044.)

XIII.

*SUMMARY OF HOLDINGS*

A. *The 2018 Climate Action Plan (CAP)*

The CAP is not inconsistent with the General Plan. Nevertheless, the judgment requiring the County to set aside and vacate its approval of the CAP is affirmed because the CAP's greenhouse gas emission projections assume effective implementation of M-GHG-1, and M-GHG-1 is itself unlawful under CEQA. Except to the extent that (1) the CAP is impacted by its reliance on M-GHG-1; and (2) the CAP's inventory of greenhouse gases is inconsistent with the SEIR (see holding (C)(4) *post*), the CAP is CEQA-compliant.

B. *M-GHG-1 is Invalid under CEQA*

Generally speaking, CEQA permits mitigation measures for GHG emissions to include offsite measures, including purchasing offsets. However, M-GHG-1 violates CEQA because M-GHG-1 does not require that (1) offset protocols meet Assem. Bill

127

No. 32 criteria as established in the California Code of Regulations, title 17, section 95972; (2) greenhouse gas emission reductions achieved are additional within the meaning of Health and Safety Code section 38562, subdivisions (d)(1) and (d)(2) and California Code of Regulations, title 17, section 95802, subdivision (a); and (3) offsets originating outside California have GHG emissions programs equivalent to or stricter than California's program.

Additionally, M-GHG-1 violates CEQA because (1) it would allow a project applicant to offset 100 percent of its GHG emissions through offset projects originating outside of California; and (2) it allows a County official to determine whether any particular offset program is feasible and otherwise appropriate, with no objective criteria to guide the exercise of that discretion.  M-GHG-1, therefore, lacks performance standards to ensure the mitigation goal will be achieved.  Therefore, the judgment directing the County to set aside and vacate its approval of the CAP and SEIR is affirmed.

    C.  *SEIR Holdings*

        1.  *The cumulative impacts analysis violates CEQA*

The SEIR's cumulative impacts analysis violates CEQA because it excludes GHG impacts from in-process GPAs.

            2.  *The finding that M-GHG-1 is consistent with the Regional Plan is not supported by substantial evidence*

The SEIR's finding that M-GHG-1 is consistent with the Regional Plan is not supported by substantial evidence. Therefore, the County abused its discretion in certifying the SEIR. (*Golden Door I*, *supra*, 27 Cal.App.5th at p. 901.)

### 3. *The failure to analyze a smart-growth alternative*

The SEIR violates CEQA because it fails to analyze a smart-growth alternative to the Project.

### 4. *Inconsistency with the* CAP

The CAP and SEIR are inconsistent with each other. The CAP states that its 2014 inventory of GHG emissions excludes emissions from GPAs that were adopted, but not constructed as of 2014. However, the SEIR states that the same inventory includes GPAs adopted between August 2011 and March 28, 2017.

For these additional reasons, the judgment directing the County to set aside and vacate its approval of the CAP and SEIR is affirmed.

### 5. *Thirty-year shelf-life*

The SEIR adequately discloses that M-GHG-1 requires offsets for only 30 years.

### 6. *Response to comments*

The County's response to comments on the DSEIR is adequate.

### 7. *Geographic scope*

The trial court erred in determining that the SEIR contains an inconsistent geographic scope because Plaintiffs failed to adequately exhaust administrative remedies on that issue (see below).

D. *Exhaustion of Remedies*

Plaintiffs adequately exhausted administrative remedies on all issues addressed by the trial court except that of geographical scope.

E. *Environmental Justice Holdings*

The County has forfeited the argument that the trial court erred in determining that the SEIR violates CEQA by failing to address environment justice impacts.

Plaintiffs have forfeited the argument that the 2011 amendment to the General Plan triggered a separate requirement to adopt an environmental justice element in the general plan.

F. *Energy Impacts*

The County has forfeited any argument that the trial court erred in determining that the SEIR failed to adequately analyze impacts to energy from GPAs and increased VMTs in exchange for GHG reduction through offsets.

G. *No Special Master Nor Advisory Opinion*

The court declines to (1) appoint a special master to oversee CEQA compliance on remand; and (2) issue an advisory opinion regarding CEQA compliance.

DISPOSITION

The trial court erred in determining that (1) the CAP is inconsistent with the GPU; (2) the County's response to comments violates CEQA; and (3) the SEIR has an inconsistent geographical scope for cumulative impacts.

The trial court did not err in concluding that "during CEQA review of GHG emissions impacts of development proposals on unincorporated County lands and the

130

issuance of any permits or entitlements for any General Plan amendment projects approved on or after February 14, 2018, the County, its agencies, agents, employees, representatives, supervisors, or other personnel should not have relied on Mitigation Measure M-GHG-1, which is contained within the County of San Diego Supplement to the 2011 General Plan Update Program Environmental Impact Report, dated January 2018."

The trial court also did not err in issuing a writ of mandate directing the County to set aside and vacate the February 14, 2018, approvals of the 2018 Climate Action Plan and the certification of the Final Supplemental Environmental Impact Report and approvals listed as specified in the final judgment filed January 16, 2019.

Furthermore, the trial court did not err in issuing an injunction stating that during review of GHG emission impacts of development proposals on unincorporated County lands under CEQA, including the review of such impacts prior to the issuance of any permits or entitlements for any General Plan amendment projects approved on or after February 14, 2018, the County, its agencies, agents, employees, representatives, supervisors, or other personnel, shall not rely on Mitigation Measure M-GHG-1.

Additionally, because M-GHG-1 is invalid under CEQA, the trial court did not err in declaring that the February 2018 Climate Action Plan and the certification of the Final SEIR to the 2011 General Plan Update Program EIR are legally inadequate and may not be used to provide the basis for CEQA review of GHG impacts of development proposals in the unincorporated County.

Because the final judgment is expressly based on findings and determinations made in the trial court's December 24, 2018 minute order, on remand the trial court is directed to (1) amend that minute order; (2) issue a new writ of mandate, injunction, and judgment; and (3) conduct further proceedings—all of which are to be consistent with this opinion. In the interests of justice, the parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(5).)

IRION, J.

WE CONCUR:


McCONNELL, P. J.


HUFFMAN, J.


APPENDIX 1

Assembly Bill No. 32 ...................................Global Warming Solutions Act of 2006

APCD.........................................................................Air Pollution Control District

CAP .................................................................................. Climate Action Plan

CAPCOA ............................... California Air Pollution Control Officers Association

CAPCOA GHG Rx................................... California Air Pollution Control Officers Association Greenhouse Gas Reduction Exchange

CARB ................................................................. California Air Resources Board

CARB Protocol..............................Compliance Offset Protocols adopted by CARB

CHECKLIST ......................................................... The CAP Consistency Checklist

EIR............................................................... Environmental Impact Report

MTCO$_2$e.............................................................. A measure of the global warming potential of a greenhouse gas

DSEIR.............................................................Draft Environmental Impact Report

GHG.......................................................................................Greenhouse Gas

GPA ...................................................... A proposed project requiring a General Plan amendment because of increased density or intensity of land use beyond that allowed under the GPU

GPU .........................................................................2011 General Plan Update

M-GHG-1 .....................................................Mitigation Measure Greenhouse Gas-1

MPO.............................................................Metropolitan Planning Organization

OPR .................................................................................. Offset Project Registry

PEIR........................................................... Program Environmental Impact Report

RTP (aka Regional Plan) .............................................Regional Transportation Plan

SANDAG................................................. San Diego Association of Governments

Senate Bill No. 32.........................................2016 legislation setting GHG reduction
goal of 40% below 1990 level

Senate Bill No. 375........................................... 2008 Sustainable Communities and
Climate Protection Act

SEIR..................................................... Supplemental Environmental Impact Report

SCS ..................................................................Sustainable Communities Strategy

VMT ................................................................................ Vehicle Miles Traveled

APPENDIX 2

"CAP Mitigation Measure M-GHG-1:  The County shall require in-process and future GPAs to reduce their emissions to ensure that CAP emission forecasts are not substantially altered such that attainment of GHG reduction targets could not be achieved Project applicants for in-process and future GPAs could accomplish this through two options, as outlined below.

"Option 1 (No Net Increase):  GPA project applicants shall achieve no net increase in GHG emissions from additional density above the 2011 GPU.  Applicants shall be required in their respective CEQA documents to quantify the GHG emissions from their projects that exceed the GHG emissions for the 2011 GPU density or intensity forming the basis of the CAP emission forecasts (i.e., projections).  This increase in emissions shall be reduced through onsite design features and mitigation measures and offsite mitigation, including purchase of carbon offset credits by the applicant.  Applicants shall demonstrate compliance with relevant CAP measures as identified in the "CAP Consistency Review Checklist" in addition to all feasible onsite design features and mitigation measures.  Offsite mitigation, including purchase of carbon offset credits, would be allowed after all feasible onsite design features and mitigation measures have been incorporated.

"For example, if 400 residential units were allowed under the 2011 GPU and a GPA proposes 500 residential units, the emissions for the additional 100 units would be calculated and offset through compliance with the CAP Consistency Review Checklist and additional feasible onsite measures and offsite measures, including the use of carbon offsets.  The emissions associated with the allowable density of 400 units would be mitigated through compliance with the CAP Consistency Review Checklist.

"The County will consider, to the satisfaction of the Director of Planning Development Services (PDS), the following geographic priorities for GHG reduction features and GHG reduction projects and programs:  1) project design features/onsite reduction measures; 2) offsite within the unincorporated areas of the County of San Diego; 3) offsite within the County of San Diego; 4) offsite within the State of California; 5) offsite within the United States; and 6) offsite internationally.

"Geographic priorities would focus first on local reduction features (including projects and programs that would reduce GHG emissions) to ensure that reduction efforts achieved locally would provide co-benefits.  Depending on the carbon offset credit utilized, co-benefits may include reductions in criteria air pollutants, toxic air contaminants, energy demand, water consumption, health benefits, social benefits, and economic benefits.  The GPA applicant or its designee shall first pursue offset projects and programs locally within unincorporated areas of the County of San Diego to the extent such carbon offset credits are available and are financially feasible, as reasonably determined by the Director of PDS.

135

"If carbon offset credits are provided as mitigation, the GPA applicant, or its designee, shall purchase and retire carbon offsets in a quantity sufficient to offset the net increase from GHG emissions above the density or intensity allowed in the 2011 GPU. This includes all GHG emissions from construction (including sequestration loss from vegetation removal) and operations.

"For the net increase of construction and operations GHG emissions prior to County's issuance of the project's first grading permit (for construction GHG emissions) or first building permit (for operations GHG emissions) the GPA applicant, or its designee, shall provide evidence to the satisfaction of the Director PDS that the project applicant or its designee has purchased and retired carbon offsets credits in a quantity sufficient to offset the net increase of construction and operations GHG emissions generated by the project. Operations emissions may be offset in phases commensurate with the overall phasing of the project.

"Carbon offset credits must be purchased through any of the following: (i) a CARB-approved registry, such as the Climate Action Reserve, the American Carbon Registry, and the Verified Carbon Standard, (ii) any registry approved by CARB to act as a registry under the state's cap and trade program, (iii) through the CAPCOA GHG Rx and the SDAPCD, or (iv) if no registry is in existence as identified in options (i), (ii). or (iii) above, then any other reputable registry or entity that issues carbon offsets consistent with Cal Health & Saf. Code section 38562(d)(1)), to the satisfaction of the Director of PDS.

"Option 2 Net Zero: GPA project applicants shall reduce all project GHG emissions to zero to achieve no net increase over baseline conditions (carbon neutrality). Project emissions shall be reduced to zero through onsite design features and mitigation measures and offsite mitigation, including purchase of carbon offset credits by the applicant or its designee. Applicants shall demonstrate compliance with relevant CAP measures as identified in the 'CAP Consistency Review Checklist' before considering additional feasible onsite design features and mitigation measures. Offsite mitigation, including purchase of carbon offset credits would be allowed after all feasible onsite design features and mitigation measures have been incorporated.

"The County will consider to the satisfaction of the Director of Planning & Development Services (PDS), the following geographic priorities for GHG reduction features, and GHG reduction projects and programs: 1) project design features/onsite reduction measures; 2) offsite within the unincorporated areas of the County of San Diego; 3) offsite within the County of San Diego; 4) offsite within the State of California; 5) offsite within the United States; and 6) offsite internationally.
"Geographic priorities would focus first on local reduction features (including projects and programs that would reduce GHG emissions) to ensure that reduction efforts achieved locally would provide co-benefits. Depending on the carbon offset credit

136

utilized, co-benefits may include reductions in criteria air pollutants, toxic air contaminants, energy demand, water consumption, health benefits, social benefits, and economic benefits.  The GPA applicant or its designee shall first pursue offset projects and programs locally within unincorporated areas of the County of San Diego to the extent such carbon offset credits are available and are financially feasible, as reasonably determined by the Director of PDS.

"If carbon offset credits are provided as mitigation, the GPA applicant, or its designee, shall purchase and retire carbon offsets in a quantity sufficient to offset all GHG emissions from the project.  This includes all GHG emissions from construction (including sequestration loss from vegetation removal) and operations.

"Prior to the County's issuance of the project's first grading permit (for construction GHG emissions) or first building permit (for operations GHG emissions) the GPA applicant, or its designee, shall provide evidence to the satisfaction of the Director of PDS that the project applicant or its designee has purchased and retired carbon offset credits in a quantity sufficient to offset all construction and operations GHG emissions generated by the project.  Operations emissions may be offset in phases, commensurate with the overall phasing of the project.

"Carbon offset credits must be purchased through any of the following: (i) a CARB-approved registry, such as the Climate Action Reserve, the American Carbon Registry, and the Verified Carbon Standard, (ii) any registry approved by CARB to act as a registry under the state's cap and trade program, (iii) through the CAPCOA GHG Rx and the SDAPCD, or (iv) if no registry is in existence as identified in options (i), (ii). or (iii) above, then any other reputable registry or entity that issues carbon offsets consistent with Cal Health & Saf. Code section 38562(d)(1)), to the satisfaction of the Director of PDS."

137